[Civ. No. 19641. Third Dist. July 25, 1983.]

TRIMONT LAND COMPANY, Plaintiff and Respondent, v.
TRUCKEE SANITARY DISTRICT, Defendant and Appellant;
DART INDUSTRIES INC., Intervener and Appellant.

332

COUNSEL

Schneider, Collison & Lange, Richard J. Schneider, Caylor, Dowling, Edwards & Kaufman and Gary M. Caylor for Defendant and Appellant.

Kronick, Moskovitz, Tiedemann & Girard, Aldolph Moskovitz, Leonard M. Friedman, James E. Thompson, Severson, Werson, Berke & Melchior, Kurt W. Melchior and Jan T. Chilton for Intervener and Appellant.

Ellman, Passovoy & Burke, Ellman, Burke & Cassidy, John D. Hoffman and Kenneth N. Burns for Plaintiff and Respondent.

OPINION

SIMS, J.—Defendant Truckee Sanitary District (TSD) and intervener Dart Industries Inc. (Dart) appeal from a judgment of the Superior Court of Sacramento County in favor of plaintiff Trimont Land Company (Trimont).[1] In essence the judgment limits the number of sewer connections TSD may grant to properties within its territorial confines in order to reserve a portion of its total capacity for the use of Trimont on property outside the district

---

[1]Although obviously interested in the outcome, cross-defendant and respondent County of Placer has filed no brief in this court; rather, it has simply joined in Trimont's position.

pursuant to a 1971 contract entered into by TSD, Trimont and the County of Placer (County). The judgment was obtained by Trimont following restrictions on sewage disposal capacity imposed on TSD by the Regional Quality Control Board. TSD currently adheres to a "first come, first served" basis for granting sewage connections and objects to the restriction on its ability to serve property within its district due to the reservation of currently unused sewage capacity to Trimont. Dart is a developer of a project within TSD. It objects to the reservation of TSD's sewage capacity for the use of Trimont because such reservation limits Dart's ability to obtain service to its property.

We hold the Legislature did not give sanitary districts such as TSD the power to grant a contractual preference for disposal capacity in the event of a shortage in capacity to those outside the district, who are not ready to use the capacity, where the preference prohibits service to members of the district ready to use the capacity. Thus, insofar as Trimont's contract attempts to provide a perpetual guarantee of disposal capacity under all circumstances, including shortage, the contract is ultra vires. Accordingly, we hold the guarantee void and reverse the judgment.

FACTS

TSD is a sanitary district organized pursuant to the Sanitary District Act of 1923, as set forth in part 1 of division 6 of the Health and Safety Code. (§§ 6400-6924.)

Trimont is a wholly owned subsidiary of Fibreboard Corporation. Fibreboard owned 25,000 acres of land in County known as the Tahoe Tree Farm. In 1970 Trimont was in the process of planning a development of the Tahoe Tree Farm. Trimont caused county to establish county service area number 21 to provide services to the planned development. Trimont obtained a conditional use permit for one phase of its development known as Northstar-at-Tahoe, commonly referred to as Northstar. The conditional use permit was subject to conditions requiring adequacy of sewage and water facilities.

Trimont planned to place ski runs, condominiums, single family lots, a golf course, and commercial areas within Northstar. In order to provide sewage service to these facilities Trimont considered several alternatives, the major two of which were an onsite plant or service by TSD. Ultimately it was determined that service by TSD was the most favorable alternative. Since Northstar is not physically within the territorial confines of TSD, it was necessary for Trimont and County to contract with TSD for the sewage service to Northstar.

A series of negotiations took place among County, Trimont and TSD, and these resulted in a written agreement signed on June 1, 1971. The agreement provided that County would construct expansion facilities to TSD's treatment ponds which would vest in TSD. The agreement further provided that: "Upon completion of construction of the expansion facilities, DISTRICT guarantees to receive, process, treat and dispose of an average daily flow of three hundred thousand (300,000) gallons of sewage from DEVELOPMENT."

At the time of the agreement, Trimont leased 50 acres of land from a third party pursuant to a lease containing a clause giving Trimont an option to purchase. Trimont's sole obligation under the TSD-Trimont agreement was to exercise its option to purchase the 50 acres upon demand by TSD within a certain time (the purchase price could be paid by County or by Trimont), to "make available" the 50 acres to TSD, and to transfer title to all or a portion thereof should TSD require fee ownership.[2] Trimont made available to TSD 12 of the 50 acres in 1973, and TSD used the 12 acres for sewage disposal between 1973 and 1975. In 1972 and 1973, County caused the expansion facilities to be built. In 1974, TSD demanded fee title to the 50 acres, but Trimont refused to convey and deposited a deed to the land in court in this action. The trial court ruled the deed should be delivered to TSD.

Pursuant to the 1971 agreement, sewage connections were made within Northstar; however, development and sales were slower than anticipated and Northstar has not required the capacity called for in the agreement. For example, as of trial, only 614 condominiums and 262 single-family homes had been built or were under construction at Northstar; TSD had a total of 4,250 connections to its sewer system, of which 3,335 were located outside of Northstar and 915 connections were at the development.

In 1971 the Legislature enacted an uncodified water act, known as the Tahoe-Truckee Sanitation Agency Act. (Stats. 1971, ch. 1560.) Pursuant to that act the regional Tahoe-Truckee Sanitation Agency (TTSA) was formed, with TSD being one of five member districts of the agency. One purpose of TTSA was to construct a regional sewage treatment plant. Funds for the construction were contributed by the United States Environmental Protection Agency, the State of California, and the member districts.

Although in 1971 the parties correctly anticipated that a regional agency would be formed, they failed to anticipate the effect of such an agency.

---

[2]The agreement provided that title would revert to the entity paying the purchase price "in the event said lands be abandoned by DISTRICT or put to a use by DISTRICT other than as sewage disposal facilities."

Because the regional facilities were to be constructed in part with federal funds, the project required preparation of an environmental impact statement (EIS) by the federal Environmental Protection Agency. The EIS set forth acceptable population projections for the area to be served by the regional facility, and these population projections were, in turn, translated into restrictions on capacity of the proposed regional facilities by order of June 19, 1975, of the State Water Resources Control Board. Thus, the 1975 order of the state board restricted capacity of the proposed regional facilities to 4.83 million gallons per day (mgd), of which 1.16 mgd were allocated to TSD, including its contract with Northstar. The state grant contract of August 1975 that provided funds for construction of the regional facilities incorporated the aforementioned restrictions on capacity.

In May 1977, the Lahonton Regional Quality Control Board issued order 6-77-27 which mandated the aforementioned restrictions on capacity. The order also required TSD to cease operating its own ponds when the regional facilities became operational (the regional plant began processing sewage in 1978). The 1977 order of the Lahonton Board was affirmed by the state board in May 1978 in order No. WQ 78-8. The legality of the order was not challenged in this action. Thus, at trial, TSD's total capacity to treat sewage, including service of Northstar, was limited to 1.16 mgd.[3]

Dart is the successor in interest of LakeWorld Development Corporation (LakeWorld). At about the same time that Trimont was planning its Northstar development in Placer County, LakeWorld was planning a resort development in Nevada County to be known as Tahoe-Donner. As a condition of subdivision map approval, Nevada County required LakeWorld to annex Tahoe-Donner to TSD to obtain sewage service. A little over a year before the Trimont-Placer-TSD contract was formed, TSD and LakeWorld entered into an agreement for annexation of Tahoe-Donner to TSD and the provision of sewer service to Tahoe-Donner by TSD. The agreement provides that LakeWorld would construct facilities for sewage works within Tahoe-Donner and that TSD would accept conveyance of title to those works and "thereafter operate, maintain, repair and replace such works and provide adequate sanitary sewer service therefrom to the lands in the project which those works are capable of serving."

---

[3]We have been asked by Trimont to take judicial notice of certain enlargements of this capacity since the date of trial. However, Trimont does not suggest that any adjustments in capacity have made it possible for all who want sewage treatment within TSD to get it. Thus, as conceded by counsel at oral argument, the issues raised at trial are not moot. To the extent that Trimont's request for taking of judicial notice asks us to litigate the matter anew in this court, we decline the invitation. (Evid. Code §§ 452, 459; *San Luis Obispo Bay Properties, Inc.* v. *Pacific Gas & Elec. Co.* (1972) 28 Cal.App.3d 556, 563-564 [104 Cal.Rptr. 733].)

Trimont filed a complaint in 1975 after a regional ban by the Lahonton Board on sewer connections. Dart intervened to assert its claim to a portion of TSD's available sewage capacity. The case was originally brought in Nevada County but venue was changed to Sacramento County due to the participation of parties who are no longer parties to the action.

The trial was lengthy and the exhibits voluminous. In awarding Trimont both declaratory and injunctive relief, the trial court proceeded on a contract theory and determined the 1971 contract constituted a continuing guarantee by TSD to reserve 300,000 gallons per day of its capacity for the benefit of Trimont. In order to prevent a breach of the continuing guarantee the court issued an injunction restraining TSD from granting more than 1,000 new connections within its territory even though Trimont was not ready to use its reserved capacity.

DISCUSSION

I

At the outset, TSD contends the trial court was simply wrong in finding, as a fact, that the 1971 agreement provided Trimont with a guarantee of 300,000 gallons of disposal capacity for so long as Trimont needed the capacity. TSD contends the trial court should have found that TSD's promise of allocated capacity terminated when the regional sewage treatment plant became operational.

■ "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party (*Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 346 [282 P.2d 23, 51 A.L.R.2d 107]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]; 6 Witkin, Cal. Procedure (2d ed. 1971) § 245, at p. 4236) and in support of the judgment (*Waller* v. *Brooks* (1968) 267 Cal.App.2d 389, 394 [72 Cal.Rptr. 228])." (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].) We note that the trial court took 35 days of testimony, most of which were devoted to an exploration of negotiations surrounding the agreement. At the conclusion of the trial, the court made 32 pages of findings of fact. Our

review of the record indicates that the trial court's finding[4] that the parties intended the 300,000 gpd allocation to continue for so long as Northstar needed it is supported by substantial evidence.

## II

We next note that, in our analysis, the limitations on TSD's disposal capacity, based on environmental concerns, are givens or axioms in this action. For example, neither the federal EIS nor the orders of the Lahonton Regional Water Quality Control Board were litigated in this case; neither federal nor state authorities were parties to the trial of the action. Accordingly, it is not for us to speculate as to whether these disposal limitations were right or wrong; we must accept them as premises and go from there. We recognize, as did the parties at trial, that the practical effect of these limitations was to create a shortage in TSD's sewage disposal capacity.

Appellant Dart contends that TSD did not have the power to enter into the guaranteed allocation provided in the 1971 agreement. Trimont argues that the 1971 agreement, including the guarantee of disposal capacity, was authorized by Health and Safety Code section 6823.[5]

---

[4]The court's most crucial finding of fact, number 42, provides as follows: "When the 1971 Agreement was executed, the parties thereto intended that TSD's obligation to guarantee 300,000 gpd of sewage service to Northstar under paragraph 4 of the Agreement would continue so long as Northstar needed the service. The parties intended that, upon County's fulfillment of the condition precedent to said obligation, TSD would be required to reserve said 300,000 gpd of service for Northstar's exclusive use, and to refrain from taking any action that would cause said 300,000 gpd of service, or any portion thereof, to be unavailable to Northstar when needed. The parties did not intend TSD's obligation to terminate after a fixed period of time, or when TSD ceased to operate its own facilities for the treatment and disposal of sewage, or when a regional agency assumed the functions of treating and disposing of sewage delivered to said agency by TSD."

[5]Health and Safety Code section 6823 provides as follows: "The district may contract with the Federal Government of the United States or any branch thereof, or with any county, city and county, municipal corporation, district or other public corporation or with any person, firm or corporation, for the joint acquisition or construction or use of any sewer or sewers or other works or facilities for the handling, treatment or disposal of sewage or industrial waste from the district and such other area as may be designated in said contract, when in the judgment of the legislative body of said district it is for the best interests of the district so to do. Any such contract may provide for the construction and maintenance of such sewer or sewers, or such other works or facilities, and for the payment by or for the parties thereto of such proportionate part of the cost of the acquisition, construction or maintenance of such sewer or sewers or other works or facilities as may be stated in said contract, the payments to be made at such times and in such amounts as may be provided by said contract. Any such contract may provide for the joint use of any sewer or sewers, works or facilities for the handling, treatment or disposal of sewage or industrial waste upon such terms and conditions as may be agreed upon by the parties thereto, and for the flowage,

## A

■ In order to find out whether section 6823 gave TSD the power to enter into a perpetual guarantee of capacity with entities outside its boundaries, the net effect of which is to grant a preference in limited capacity to those outside the district over those inside the district, we are mindful that "In construing a statute 'we begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law."' (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ 'An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512]; *Moyer* v. *Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d, at p. 230.) Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].) 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' (*People* v. *Knowles, supra,* 35 Cal.2d, at p. 183; *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d, at p. 604.)" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

■ Section 6823 plainly authorizes a sanitary district to enter into contracts with counties or with private individuals for the treatment or disposal of sewage. Thus, the first paragraph of the statute provides in relevant part that "The district may contract with . . . any county . . . with any person, firm or corporation, for the . . . use of any sewer or sewers or other works or facilities for the handling, treatment or disposal of sewage or industrial waste from the district and such other area as may be designated in said

---

treatment or disposal of sewage or industrial waste from such area for each of the parties thereto as may be described in the contract. [¶] Any district which has acquired or constructed or which proposes to acquire or construct, any sewer or sewers, or works or other facilities for the handling, treatment or disposal of sewage or industrial waste, may contract with the Federal Government of the United States or any branch thereof, or with any county, city and county, municipal corporation, district or other public corporation or with any person, firm or corporation for the use of any such sewer or sewers, works, or facilities by any such county, city and county, municipal corporation, district or other public corporation, or for the flowage, treatment or disposal of sewage or industrial waste from any area designated by such person, firm or corporation so contracting, upon such terms and conditions as may be provided in said contract."

Unless otherwise indicated, all statutory references are to the Health and Safety Code.

contract . . . ." The second paragraph of the statute, which appears to be somewhat redundant, provides that a district "may contract with . . . any county . . . or with any person, firm or corporation for the use of any such sewer or sewers, works, or facilities . . . ." Thus, we agree with the Attorney General's analysis that the statute allows a sanitary district and a private subdivider to enter into a contract for the construction and use of sewer facilities controlled by the district. (See 28 Ops.Cal.Atty.Gen. 347 (1956).)

We note that section 6823 further allows such a contract to provide for the disposal of sewage from areas located outside the geographic confines of the district. Thus, the first paragraph of the statute allows such a contract to provide for the "handling, treatment or disposal of sewage or industrial waste from the district *and such other area as may be designated in said contract* . . . ." (italics added) and the second paragraph of the statute similarly states that such a contract may provide for the "disposal of sewage or industrial waste *from any area* designated by such person, firm or corporation so contracting . . . ." (Italics added.)

Although the plain meaning of section 6823 allows the district to contract with those outside the district for the disposal of sewage, the statute is less clear with respect to whether it authorizes the district to enter into a contract that guarantees disposal capacity perpetually to an outsider where enforcement of the guarantee would mean that outsiders not ready to use disposal capacity would receive a preference over members of the district who have a present need to use the capacity. On the one hand, the first paragraph of section 6823 provides in part that a contract may be "upon such terms and conditions as may be agreed upon by the parties thereto . . . ." And the second paragraph of the statute provides in part that disposal of sewage may be "upon such terms and conditions as may be provided in said contract." These clauses, of course, suggest the district has the power to enter into any kind of contract it wants to, presumably including a contract perpetually guaranteeing disposal capacity under all circumstances to those outside the district.

On the other hand, we note that the first paragraph of the statute authorizes the district to enter into such contracts "when in the judgment of the legislative body of said district *it is for the best interests of the district so to do.*" (Italics added.) This language suggests that the Legislature intended section 6823 to be of primary benefit to inhabitants of the district and not to those located outside it.[6] We conclude that section 6823 is sufficiently

---

[6]We are not persuaded that Trimont's guarantee is immune from attack on the ground that the legislative body of TSD must have concluded that the guarantee was in the best interest of the district when it entered in the agreement in 1971. We recognize that courts "cannot enter the board room and substitute their judgment for that of the board nor interfere at all

ambiguous on its face so that we must undertake further efforts of interpretation.[7]

## B

We are unaware of any case in California construing section 6823 or discussing the power of a sanitary district to dispose of sewage for those outside the district. Both sides to this dispute have cited cases involving the extraterritorial provision of utility services by cities. We thus examine whether we may look to the law of municipal corporations for guidance.

In *In re Werner* (1900) 129 Cal. 567 [62 P. 97], the Supreme Court declared invalid a resolution of a sanitary district that imposed criminal sanctions for failure to get a liquor license from the district, where the county in which the district was located had enacted a system of liquor licensing and had issued permits to the petitioner. The court said: "A sanitary district, no more than an irrigation district, or a reclamation district, or a drainage district, possesses police powers properly belonging to cities and municipal bodies exercising local governmental functions. Such districts are created for the purpose generally of some special local improvement, and should exercise only such powers as may be conferred upon them by the legislature in the line of the object of their creation. Although in the nature of public corporations, they are not municipal corporations in the proper sense of that term. All municipal corporations are public corporations, but the converse does not follow that all public corporations are municipal. Railroad corporations are deemed quasi public corporations, but they are not deemed quasi municipal corporations. In some of the cases expressions may doubtless be found which would seem to indicate that public corporations and municipal corporations are synonymous, but it is, nevertheless, inaccurate to designate a drainage district or a sanitary district,

---

with its action unless the board is exceeding its legislative powers, its judgment or discretion is being fraudulently or corruptly exercised." (*Nickerson* v. *San Bernardino* (1918) 179 Cal. 518, 522-523 [177 P. 465].) Here, however, there is not a tenable argument to the effect that TSD exercised an informed discretion so as to prefer the allocation to Trimont over its own inhabitants in the ultimate best interest of the district. The evidence is uncontradicted that none of the parties to the 1971 agreement anticipated the imposition of finite limitations on sewage capacity. Consequently, at the time of entering into the agreement, TSD had no reason to expect that the agreement would require it to prefer outsiders to members of its district. Since the time that finite limitations on sewage capacity were imposed by the Lahonton Regional Water Quality Control Board, TSD has consistently taken the position that the 1971 agreement is not in the best interest of the district. Consequently, our decision is in accordance with the discretion exercised by TSD's board to the effect that, in light of unanticipated finite disposal restrictions, the agreement is not in the best interest of the district.

[7]The only legislative history on section 6823 that we have located is the report of the Legislative Counsel, which sheds no light on our problem.

although public corporations, as municipalities." (*Id.,* at p. 572.)[8] This characterization of a sanitary district as a public corporation was reaffirmed by our Supreme Court in 1971 in *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 495 [96 Cal.Rptr. 553, 487 P.2d 1193].

In *Petition East Fruitvale Sanitary Dist.* (1910) 158 Cal. 453 [111 P. 368], the court held that a sanitary district was automatically dissolved when it was annexed in its entirety to the City of Oakland. The court's rationale was " 'that sanitary districts are public corporations, though not designated as corporations by the statute, and that all their powers, duties and privileges are such as are incident to municipal corporations formed under the Municipal Government Act, or existing under freeholders' charters, though not possessing many important powers, duties and privileges of the latter, and that the same powers could not, after annexation, be exercised by each in the same territory. But if the statute permits territory embraced in or covered by a sanitary district to be annexed to a city—*a municipal corporation of a higher class* and capable of exercising the same functions as well as others essential to municipal government—such statute contemplates, *ex necessitate rei,* a cession of the powers of the *inferior corporations* to the greater, and a consequent dissolution of the former as a result of the annexation.' . . ." (*Id.,* at p. 458, quoting *People* ex rel. *Cuff* v. *City of Oakland* (1899) 123 Cal. 598, 600-601 [56 P. 445], italics added.)

These cases make it clear that, for purposes of ascertaining the scope of powers properly exercised by a sanitary district, the district is characterized as a public corporation, inferior to a municipal corporation.[9] McQuillin calls public corporations "quasi-municipal corporations" and defines them

---

[8]It is possible to read *Werner* as suggesting that sanitary districts do not exercise police powers. Subsequent cases have rejected that view and have held that sanitary districts owe their very existence to a delegation of portions of the police power by the Legislature. (See discussion, *post,* at pp. 347-348.) In *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, at page 496 [96 Cal.Rptr. 553, 487 P.2d 1193], the Supreme Court interpreted *Werner* "as forbidding only the delegation of power to prescribe penalties for violations of ordinances. [Citations.]"

[9]We are aware that rules of tort liability of a sanitary district have been held to be "analogous to the rules applicable to municipal corporations." (*Ambrosini* v. *Alisal Sanitary Dist.* (1957) 154 Cal.App.2d 720, 725 [317 P.2d 33].) In determining whether special districts are municipal corporations, the courts have given important consideration to the objective sought to be achieved by the statute or constitutional provision applicable to the special district. (See *Rock Creek etc. Dist.* v. *County of Calaveras* (1946) 29 Cal.2d 7, 9 [172 P.2d 863].) Thus, it has been held that, for purposes of exemption from taxation, "the term municipal corporation must be given a broad meaning unrestrained by the strict technical sense of the term." (*Id.,* at p. 10.) In the instant case, we are concerned not with tort liability or exemption from taxation but rather with the scope of power delegated to a sanitary district by the Legislature. For our purposes, we perceive no reason to depart from the characterization of sanitary districts as public corporations, particularly since that view was reaffirmed by our Supreme Court in 1971 in *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480.

as "bodies which possess a limited number of corporate powers and which are low down in the scale or grade of corporate existence, and consist of various local government areas established to aid the administration of public functions." (1 McQuillin, Municipal Corporations (3d ed. 1971) § 2.13, p. 151.) Accordingly, while we will examine the authorities cited to us on the subject of the powers of municipal corporations to furnish extraterritorial utility services, we will do so with the understanding that a public corporation, such as TSD, may not necessarily exercise the powers of a municipal corporation. Conversely, where we discover limitations on the power of a municipal corporation to provide extraterritorial service, we will assume that those limitations apply with at least equal force to TSD, unless, of course, the limitations are set forth in a constitution or legislative enactment made expressly applicable to the municipal corporation in question.

## C

We first examine California cases construing the power of municipal corporations to dispose of sewage beyond their boundaries. ▮ Unless the law expressly provides to the contrary, a California municipal corporation may construct a system to dispose of its sewage outside its boundaries, because "Proper sewers are in this day so essential to the hygiene and sanitation of a municipality, that a court would not look to see whether a power to construct and maintain them had been granted by the charter, but rather only to see whether by possibility the power had been expressly denied." (*McBean* v. *City of Fresno* (1896) 112 Cal. 159, 163 [44 P. 358]; see *Southern Cal. Gas Co.* v. *City of L. A.* (1958) 50 Cal.2d 713, 718 [329 P.2d 289]; *Harden* v. *Superior Court* (1955) 44 Cal.2d 630, 639 [284 P.2d 9].) The power to dispose of sewage generated by a municipality has been called "a power so important that it is one of the few powers [a municipality] may exercise outside of its territorial limits without express authorization." (*Southern Cal. Gas Co.* v. *City of L. A., supra,* 50 Cal.2d at p. 718.)

The reason for the foregoing rule was discussed in *Mulville* v. *City of San Diego* (1920) 183 Cal. 734 at pages 737-738 [192 P. 702] as follows: "In general, a municipality is competent to act beyond its boundaries only in those cases in which it is so empowered by legislative authority and it is necessary, in passing upon the validity of acts of a municipality performed beyond its boundaries, to look to the general laws and municipal charter for the requisite authority. In certain instances, *owing to the urgency of extreme expediency or necessity,* express authority is dispensed with and the power of the municipality to perform certain acts beyond its boundary is implied as incidental to the existence of other powers expressly granted. Thus, it has been held that, where a municipality has power to construct sewers, it may, as an implied incident to such power, extend the same beyond its

boundaries when necessary or manifestly desirable. (*McBean* v. *City of Fresno,* 112 Cal. 159, [53 Am.St.Rep. 191, 31 L.R.A. 794, 44 Pac. 358]; *City of Coldwater* v. *Tucker,* 36 Mich. 474; *Cochran* v. *Village of Park Ridge,* 138 Ill. 295, [27 N.E. 939]; 4 McQuillin on Municipal Corporations, sec. 1434.) McQuillin, in his work on Municipal Corporations, states the rule as follows: 'The general rule is that without legislative grant the authority of the municipal corporation is confined to its own area, hence its acts and ordinances have no force beyond its corporate limits. Thus, in the absence of such grant the municipality cannot open a street, repair a highway, grade an avenue, or aid in the construction of a plank road or bridge beyond its boundaries. Sometimes authority to act outside of the municipal boundaries may be implied on the ground of *necessity,* as for example, to obtain outlets for sewers and drains. . . . Likewise a municipality possessing power to supply its inhabitants with water, may acquire for that purpose, a water supply without its territory. Certain municipalities have been held to be authorized to supply light and water to points beyond their limits.' (4 McQuillin on Municipal Corporations, sec. 1824.) ▪ Therefore, in the case of a municipality, power to act outside of the boundaries of the municipality is dependent entirely upon legislative grant; it does not exist unless expressly granted, necessarily or fairly implied in or incident to the powers expressly granted, or essential to the declared objects and purposes of the corporation. (*Hyatt* v. *Williams,* 148 Cal. 585, 587, [84 Pac. 41]; *South Pasadena* v. *Pasadena Land etc. Co.,* 152 Cal. 579, 590, [93 Pac. 490].)'' (Italics added.)

In *Tronslin* v. *City of Sonora* (1956) 144 Cal.App.2d 735 [301 P.2d 891], the court upheld the power of a municipality to contract to furnish sewage disposal service to those outside its boundaries. In *Tronslin,* the City of Sonora acquired by contract a right-of-way across land of plaintiff's predecessor in interest for the purpose of installing a main sewer line to the city's primary treatment plant. A prior judgment had declared the contract contemplated that plaintiff was entitled to connect to the line without charge. After houses were built, the city levied a $24 per year charge on each house for sewer service. The court held that, although plaintiff could not have compelled the city to service his property, the contract was enforceable and precluded the city from imposing the yearly charge.

Although the source of the city's power to contract to supply *extraterritorial* service was not expressly discussed in *Tronslin,*[10] we view the case

[10]The opinion states that "the installation of the sewage system was quite obviously an exercise of the police power of the defendant city for the public health and welfare of its residents" (*Tronslin* v. *City of Sonora, supra,* 144 Cal.App.2d at p. 737); however, there is no discussion of the source of the city's authority to exercise the power *outside its boundaries.*

as one falling within the rule of *McBean, Southern Cal. Gas Co.*, and *Harden*, i.e., one in which the necessity of disposing of sewage generated by the city justified the exercise of an implied *extraterritorial* power. In short, the contract between Tronslin's predecessor and the city was one necessary to dispose of the city's sewage.

■ We acknowledge that a public corporation such as TSD can exercise certain implied powers.[11] However, in our view, neither *Tronslin* nor its predecessors (*McBean* et al.) are applicable here.[12] Where a municipal corporation asserts implied powers to act outside its territorial limits based on necessity, indispensability or emergency of the power exercised, the courts will inquire as to the basis of the asserted necessity, indispensability or emergency. (See *City of Oakland* v. *Brock* (1937) 8 Cal.2d 639, 642-643 [67 P.2d 344]; *County of Los Angeles* v. *City Council* (1962) 202 Cal.App.2d 20, 26 [20 Cal.Rptr. 363].) Here, the negotiations between Trimont and TSD clearly indicate the contract in question was not executed for the purpose of helping TSD get rid of sewage generated within the district. To the contrary, the record indicates the object of the contract in question was primarily to allow Trimont to build out its recreational subdivision. There was no "urgency of extreme expediency or necessity" (*Mulville* v. *City of San Diego, supra,* 183 Cal. at p. 737) that would allow us to read into section 6823 an implied power allowing TSD to contract with Trimont so as to prefer Trimont's future users over TSD's ready members.

Nor is such an implied power "essential to the declared objects and purposes of the corporation." (*Mulville, supra,* at p. 738.) In *Guptill* v. *Kelsey* (1907) 6 Cal.App. 35, 38 [91 P. 408], this court described the primary purpose of the Sanitary District Act of 1891 (the predecessor of the 1923 act pursuant to which TSD exists)[13] as follows: "The main object of the law appears to be the authorization of the establishment of sanitary districts in such communities for the purpose of investing them with such corporate rights as will the more effectually enable *the residents thereof* to promote and maintain healthful sanitary conditions *within the boundaries* of such

---

[11]One commentator has suggested that "Sewerage and sanitary districts and authorities have only such powers as are expressly granted to them, such as are impliedly necessary to effectuate the conferred powers, and those incidental powers necessary to operate as an independent legal entity." (3A Antieau, Local Government Law (1983) Independent Local Government Entities, § 30G.02, p. 30G-6; see *Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 246 [74 Cal.Rptr. 398, 449 P.2d 462].)

[12]In addition to the fact that the contract in *Tronslin* was executed as an incident to the extraterritorial disposal of the city's sewage, the case is distinguishable from ours in other respects. In *Tronslin,* the $24 per year sewer charge was imposed on those already using the service. Moreover, there was no shortage of capacity.

[13]See Statutes 1891, chapter CLXI, page 223. The 1891 act was repealed by Statutes 1939, chapter 1124, page 3072. (See also Stats. 1939, ch. 60, p. 616 et seq.)

districts." (Italics added.) The furnishing of scarce sewage disposal capacity to those outside the district, who are not ready to use the service, is not a power essential to the promotion within the district of healthful and sanitary conditions for district residents who cannot dispose of their sewage. Consequently, we conclude that TSD's power to serve those outside the district, in the circumstances of this case, cannot be based on implied powers arising out of necessity. (See *City of Oakland* v. *Brock, supra,* 8 Cal.2d at p. 641.)

## D

We next examine California cases cited to us involving the extraterritorial provision of utility services, other than sewage disposal, by municipalities or utility districts. We find those authorities inapposite for a variety of reasons. First, since 1911, when article XI, section 19 of the California Constitution was adopted, municipal corporations have been expressly authorized to supply light, water, power, heat, transportation, telephone service, or other means of communication (but not sewage disposal) to those outside the boundaries of the corporation.[14] Former article XI, section 19 was replaced by current article XI, section 9 on June 2, 1970. (3 Deering's Const. Ann., p. 137.) Current article XI, section 9, subdivision (a) provides: "A municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication. It may furnish those services outside its boundaries, except within another municipal corporation which furnishes the same service and does not consent."

These constitutional provisions have been held to authorize municipal corporations to furnish the utility services enumerated in the provisions to those outside the municipality. (See, e.g., *City of North Sacramento* v. *Citizens Utilities Co.* (1961) 192 Cal.App.2d 482, 483-484 [13 Cal.Rptr. 538] [water]; *Sawyer* v. *City of San Diego* (1956) 138 Cal.App.2d 652, 657 [292 P.2d 233] [water]; *Sacramento etc. Dist.* v. *Pac. G. & E. Co.* (1946) 72 Cal.App.2d 638, 653 [165 P.2d 741] [power]; *City of Mill Valley* v. *Saxton*

---

[14]As adopted October 10, 1911, article XI, section 19 provided: "Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communcation. Such works may be acquired by original construction or by the purchase of existing works, including their franchises, or both. Persons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law, on condition that the municipal government shall have the right to regulate the charges thereof. A municipal corporation may furnish such services to inhabitants outside its boundaries; *provided,* that it shall not furnish any service to the inhabitants of any other municipality owning or operating works supplying the same service to such inhabitants, without the consent of such other municipality, expressed by ordinance." (Const. of U.S. and Cal. and other documents (Cal. Sect. of State ed. 1912) p. 127.)

(1940) 41 Cal.App.2d 290, 293 [106 P.2d 455] [transportation]; *Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133, 137 [102 P.2d 759] [water].) These cases have no bearing on our problem for several reasons. First, as we have noted,[15] TSD is a public corporation, not a municipal corporation, so that the applicable constitutional provisions do not apply to it. Second, TSD furnishes services (sewage disposal) not mentioned in article XI. Third, the constitutional basis upon which sanitary districts exercise their powers is not found in article XI but rather in a delegation by the Legislature of "certain portions of the police power of the state." (*Guptill* v. *Kelsey, supra,* 6 Cal.App. at p. 38; *In re Werner, supra,* 129 Cal. at p. 572; *Tronslin* v. *City of Sonora, supra,* 144 Cal.App.2d at p. 737; see also *Woodward* v. *Fruitvale Sanitary Dist.* (1893) 99 Cal. 554, 562-563 [34 P. 239]; *In re Madera Irrigation District* (1891) 92 Cal. 296, 307-308 [28 P. 272].)

The parties have cited California cases that have recognized that where a municipality or utility district acquires an established system that supplies persons outside the municipality or district with water or power, the acquiring entity "must, on principles of fairness and justice, continue the service which was furnished outside the district, where this can be done efficiently and economically." (*Sacramento etc. Dist.* v. *Pac. G. & E., supra,* 72 Cal.App.2d at p. 653; see *East Bay M. U. Dist.* v. *Railroad Com.* (1924) 194 Cal. 603, 621 [229 P. 949]; *South Pasadena* v. *Pasadena Land etc. Co.* (1908) 152 Cal. 579, 593 [93 P. 490]; *Fellows* v. *City of Los Angeles* (1907) 151 Cal. 52, 64 [90 P. 137]; *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d at p. 137.) In the instant case, of course, TSD did not acquire an existing system the disruption of which would be unfair to those served by it.

Finally, we are aware of no California case holding that outsiders served by a municipality or district are entitled to a preference over inhabitants in the event of a shortage of utility service.[16] Thus, in upholding a contractual duty of a city to supply outsiders with water, the court in *Sawyer* v. *City of San Diego, supra,* 138 Cal.App.2d at page 658, was careful to note: "The record does not indicate that at the time of trial the city was without sufficient water to supply its inhabitants."

---

[15]See discussion *ante,* pages 342-343.

[16]Indeed, as we point out in part II (F), *post,* we are unaware of any case in the United States that has so held. Trimont relies on *Morrison Homes Corp.* v. *City of Pleasanton* (1976) 58 Cal.App.3d 724 [130 Cal.Rptr. 196] and *Carruth* v. *City of Madera* (1965) 233 Cal.App.2d 688 [43 Cal.Rptr. 855]. Both cases upheld the validity of annexation agreements containing commitments for sewage disposal. In both cases the lands subject to the agreements were actually annexed to the cities in question. Consequently, no issue was raised with respect to any preference between those located within and those located without a city or district.

E

Since our survey of California municipal corporation law has produced no ready answer to our problem of interpreting section 6823, we turn to more general guidelines of statutory interpretation and to the law of other jurisdictions. ■ " 'It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them. [Citations.]' (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [fn. omitted] [288 P.2d 12, 289 P.2d 242]; *Cole* v. *Rush, supra,* 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137]; *Whitley* v. *Superior Court* (1941) 18 Cal.2d 75, 78 [113 P.2d 449].)" (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].) ■ Accordingly, we presume that, in enacting section 6823, the Legislature had in mind the holding of *Guptill* v. *Kelsey, supra,* 6 Cal.App. 35, that the purpose of a sanitary district is to "enable the residents thereof to promote and maintain healthful sanitary conditions within the boundaries of such districts." (*Guptill, supra,* at p. 38.) This provincial purpose of a sanitary district is like the chief function of a water or irrigation district,[17] which is "to supply water for irrigation to landowners within its boundaries." (*Rock Creek etc. Dist.* v. *County of Calaveras, supra,* 29 Cal.2d at p. 9.)

■ "[I]t is not to be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication. [Citations.]" (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 644 [122 P.2d 526], followed in *People* v. *Cardenas* (1982) 31 Cal.3d 897, 913-914 [184 Cal.Rptr. 165, 647 P.2d 569]; see *Duggan* v. *Superior Court* (1981) 127 Cal.App.3d 267, 270 [179 Cal.Rptr. 410].) We note that the foregoing rule of *Frisbie* has been applied to test the scope of broad contract powers granted by the Legislature to local agencies. For example, in *Jaynes* v. *Stockton* (1961) 193 Cal.App.2d 47 [14 Cal.Rptr. 49], the court relied on *Frisbie* to prohibit a local school district from contracting with a private attorney for specialized legal services, pursuant to then existing Government Code section 53060. That statute then provided: " 'The legislative body of any public or municipal corporation or *district may contract with and employ any persons* for the furnishing to the corporation or district special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are spe-

---

[17]The powers of a sanitary district have been expressly analogized to the powers of irrigation districts. (See *Pixley* v. *Saunders* (1914) 168 Cal. 152, 160 [141 P. 815]; *In re Werner, supra,* 129 Cal. at p. 572.)

cially trained and experienced and competent to perform the special services required.'" (*Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at p. 49, italics added.) Holding that section 53060 did not authorize the district to contract with the private attorney, the court recognized the long-standing, court-made rule that a public agency created by statute may not contract and pay for services which the law requires a designated public official to perform without charge (in this instance county counsel): "The statute under consideration expressly confers upon school districts the power to contract for special services; does not specify that the special services for which such a contract may be made include those available from a public source as well as those not so available; was enacted after the courts of this state had declared that a public agency did not have authority under its general powers to pay for services required to be performed by a public official without charge; and, if applicable to services available from public sources, would overthrow the foregoing rule of long standing." (*Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at pp. 56-57.)

■ In the instant case, the most compelling basis upon which authority for the perpetual guarantee to Trimont can be asserted is the general language found in section 6823 to the effect that the contract contemplated by the statute may be "upon such terms and conditions as may be provided in said contract." However, in light of the long-recognized judicial characterization of the purpose of a sanitary district, to wit, to provide service to its own members, we conclude that the general grant of power in section 6823 may not be construed to allow a sanitary district to prefer outsiders over its members in the event of a shortage. If that was what the Legislature wanted, it could have said so explicitly. (See *Big Sur Properties* v. *Mott* (1976) 62 Cal.App.3d 99, 105 [132 Cal.Rptr. 835]; *Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at pp. 56-57.)

■ Moreover, this court has said that "the rule is well established that language purporting to define the powers of a municipal corporation is to be strictly construed, and . . . the power is denied where there is any fair, reasonable doubt concerning the existence of the power. (*City of Madera* v. *Black,* 181 Cal. 306 [184 P. 397].)" (*City of North Sacramento* v. *Citizens Utilities Co., supra,* 192 Cal.App.2d at p. 483.) ■ Here, we have at least a reasonable doubt that the Legislature intended to give TSD the power to prefer outsiders, with only speculative need for service, over its own needy members.

■ Finally, we are mindful that a statute should be construed to eliminate doubts as to the provision's constitutionality. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) ■ Here Dart has launched a

formidable attack on section 6823, contending if the statute is construed to permit TSD to contract away its disposal capacity under all circumstances, including shortage, the statute unconstitutionally permits the contracting away of the police power of the state. (See *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 23, fn. 20 [52 L.Ed.2d 92, 110, 97 S.Ct. 1505] and authorities cited therein; *Pennsylvania Hospital* v. *Philadelphia* (1917) 245 U.S. 20 [62 L.Ed. 124, 38 S.Ct. 35]; *Butchers' Union, etc., Co.* v. *Crescent City, etc., Co.* (1884) 111 U.S. 746 [28 L.Ed. 585, 4 S.Ct. 652]; *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546]; *Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464 [93 P. 70]; *Fidelity Land and Trust Co. of Tex.* v. *City of W. Un. Place* (Tex.Civ.App. 1973) 496 S.W.2d 116; *Ericksen* v. *Sioux Falls* (1944) 70 S.D. 40 [14 N.W.2d 89]; *City of Teague* v. *Sheffield* (Tex.Civ.App. 1930) 26 S.W.2d 417.)

When we apply these principles to our interpretation of section 6823, we can find no basis upon which to conclude that the Legislature intended to grant a sanitary district, such as TSD, the contractual power to grant a preference in limited disposal capacity to those outside the district, not ready to use the capacity, over its inhabitants who have a current need for such service. Accordingly, we hold that the first sentence of paragraph 4 of the 1971 TSD-Trimont agreement, purporting to grant a perpetual guarantee of disposal capacity to Trimont under all circumstances, including shortage, is ultra vires and void.[18] (See *Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at p. 57; *City of Oakland* v. *Key System* (1944) 64 Cal.App.2d 427, 441 [149 P.2d 195]; *Stierle* v. *Sanitation Dist. No. 1* (Ky. 1951) 243 S.W.2d 678, 680; 10 McQuillin, Municipal Corporations (3d ed. 1981) § 29.10, pp. 236-238.) This result eliminates doubts as to the constitutionality of section 6823. (See *Associated Home Builders etc. Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582.)

F

Our conclusion is reinforced by our survey of municipal corporation law in other jurisdictions.[19] (See generally, Annot., Power of Municipal Corporation to Extend its Service Beyond Corporate Limits (1927) 49 A.L.R. 1239, supplemented (1935) 98 A.L.R. 1001; Annot., Right to Compel Mu-

---

[18]The first sentence of paragraph 4 of the TSD-Trimont agreement provides: "Upon completion of construction of said expansion facilities, DISTRICT guarantees to receive, process, treat and dispose of an average daily flow of three hundred thousand (300,000) gallons of sewage from DEVELOPMENT."

[19]As we have noted (see p. 348, *ante*), we are unaware of any California case that has expressly considered the provision of municipal utility service to those outside the municipality in the event of shortage.

nicipality to Extend its Water System (1926) 45 A.L.R. 829, supplemented (1956) 48 A.L.R.2d 1222.) Our review of cases that have considered the power of a municipality to furnish utility service to outsiders reveals a consistent, unbroken pattern. In defining the limits of the power of a municipality to provide utility service to those outside the territorial limits of the municipality, the courts have often started from a judicially created premise, analogous to that applied to sanitary districts in our state by *Guptill* v. *Kelsey, supra,* 6 Cal.App. 35,[20] that the first duty of the municipality is to provide service to those within its territorial limits, to whom a primary allegiance is owed. This characterization has then been applied as a benchmark for the purpose of interpreting constitutions, statutes, or charters empowering municipalities to provide extraterritorial service, with the result that such empowering provisions have been construed narrowly to allow extension of service to outsiders only to the extent that a surplus of service is available after the needs of inhabitants are satisfied.

For example, in *City of Sweetwater* v. *Hamner* (Tex.Civ.App. 1923) 259 S.W. 191, rehearing denied 259 S.W. 197, plaintiff attempted to enjoin the sale of water by the city to a plant of United States Gypsum Company located two and one-half miles outside the city limits. The trial court refused to halt the sale itself but enjoined the city from expending city funds to construct water mains connecting the city's water works with the plant. One Texas statute provided that any city could construct or operate water systems inside or outside the city limits and could sell water to any person or corporation outside of the limits of the city "under such terms and conditions as may appear to be for the best interests of such . . . city." (P. 194) Another statute provided that a city "shall have the right to prescribe the kind of water . . . mains . . . within or beyond the limits of such . . . city . . . ." (*Ibid.*)

Notwithstanding these grants of power, the court found no authority for the city to spend its funds for construction of the water main to the United States Gypsum Company plant: "A municipal corporation cannot exercise its powers outside its limits, except when granted express legislative authority so to do, for all power and privileges conferred by the Constitution and statutes on municipal corporations must be held to be limited in their exercise to the territory embraced in the municipal boundaries, and for the

---

[20]See discussion, *ante,* at pages 346-347. There is a similar suggestion in *South Pasadena* v. *Pasadena Land etc. Co.* (1908) 152 Cal. 579 [93 P. 490], where the Supreme Court upheld the acquisition by the City of Pasadena of a water system located outside the city on grounds, inter alia, that "a municipal or public corporation may carry on a system and supply water to persons outside its limits, whenever it becomes necessary or convenient to do so in order to accomplish *the main purpose of supplying water to those within.*" (*Id.,* at p. 590, italics added; followed in *Sawyer* v. *City of San Diego, supra,* 138 Cal.App.2d at p. 657.)

benefit of the inhabitants of the municipality, unless the Constitution or statute expressly provides that such power and privilege may be exercised beyond the corporate boundaries and for the benefit of nonresidents. 28 Cyc. 266; Dillon on Municipal Corporations, § 565. If a city was authorized under this act to extend its water mains beyond its city limits for the purpose of furnishing water to persons or corporations residing outside the limits of such city at a distance of 2-1/2 miles, as alleged in this case, or even 10 feet, it would have the authority to extend such mains to a much greater distance. We do not think such authority is reasonably implied or expressly conferred by the act in question, nor that it would be in harmony with the general purposes of a municipal corporation. The primary purpose of a municipal corporation is to contribute towards the welfare, health, happiness, and public interest of the inhabitants of such city, and not to further the interests of those residing outside of its limits." (*City of Sweetwater* v. *Hamner, supra,* 259 S.W. at p. 195.)

In *Richards* v. *City of Portland* (1927) 121 Ore. 340 [255 P. 326], the City of Portland had entered into a series of two-year contracts with water districts located outside the city. During several years, in July and August, the city encountered a water shortage that had serious effects on its consumers. Consequently, the city passed an ordinance requiring water districts served by the city to construct storage facilities. Two outside districts failed to construct the storage facilities; the city refused to renew their water supply contracts when they expired; and the districts sued to enjoin the city from cutting off water.

The Oregon Supreme Court considered two statutes that allowed the city to serve outsiders. One statute, section 3770, Oregon Laws, then provided in relevant part: " 'That any incorporated city or town . . . owning . . . a system of waterworks . . . for supplying water . . . for its inhabitants, and for general municipal purposes, . . . shall have the right, and are hereby authorized . . . to sell, and supply and dispose of water . . . from such system to any person . . . within or without the limits of such incorporated city . . . and to make contracts in reference to the sale and disposal of water . . . from such system, for use within or without the corporate limits.' " (*Richards* v. *City of Portland, supra,* 255 P. at p. 329.)

Holding that the city was not empowered either by this statute or its charter to act as a public utility for the purpose of furnishing water to outsiders, the court said, inter alia: "The water system was established at the expense of the taxpayers of the city, and a holding that those who have not borne such burden shall have equal rights therein would not be based on sound equitable principles. . . . The water system was constructed primarily to serve those who paid for it. When such projects are undertaken

by a municipality, the capacity of the plant is generally in excess of its present use, and it is reasonable to assume that sale of surplus water was contemplated." (*Ibid.*) Injunctive relief to the water districts was denied. (P. 330.)

Similarly, in *Farwell* v. *City of Seattle* (1906) 43 Wash. 141 [86 P. 217], the Washington Supreme Court held the City of Seattle had no authority to furnish water to the City of Ballard. The court said, inter alia: "Respondents, however, invoke the statu[t]e of 1897 (page 326, c. 112, § 1, Session Laws 1897). It will be observed that the language of that statute in defining the powers of cities to construct and operate waterworks confines the purpose to the 'furnishing of such city or town and the inhabitants thereof and any other persons with an ample supply of water.' The words 'and any other persons' do not appear in the former statute or in the [current charter provision]. Respondents contend that the additional words confer authority upon the city to extend its water service beyond its corporate limits, and even to another municipal corporation. We think we are not warranted in giving such a sweeping construction to the words used. Such an important and unusual extraterritorial power should be so clearly expressed as not to be otherwise understood before the courts should say that the Legislature intended to confer such a power." (*Farwell* v. *City of Seattle, supra,* 86 P. at p. 218; see also *Paris* v. *Sturgeon* (1908) 50 Tex.Civ.App. 519 [110 S.W. 459].)

Finally, we are aware of cases that have upheld the furnishing of water to those outside the city limits with strong expressions of dictum to the effect that any extraterritorial supply would be limited to a surplus available only after needs of inhabitants were satisfied. (See e.g. *Bair* v. *Mayor and City Council of Westminster* (1966) 243 Md. 494 [221 A.2d 643, 645]; *Phoenix* v. *Kasun* (1939) 54 Ariz. 470 [97 P.2d 210, 212, 127 A.L.R. 84]; *Rogers* v. *Wickliffe* (1906) 29 Ky.L.R. 1906 [94 S.W. 24, 25].) An analogous case involving the extraterritorial provision of sewer service is *Estes Park* v. *Mills* (1937) 100 Colo. 94 [65 P.2d 1086, at pages 1088-1089].

We acknowledge that these decisions do not control our interpretation of section 6823, because we have no evidence that section 6823 was patterned after any of the statutory or charter provisions construed in these out-of-state cases. (Compare *Union Oil Associates* v. *Johnson* (1935) 2 Cal.2d 727, 735 [43 P.2d 291, 98 A.L.R. 1499].) Nonetheless, we find persuasive the uniformity with which these cases have interpreted legislative grants of power to municipal corporations so as to prefer the rights of inhabitants to the rights of outsiders in adjudicating problems arising out of the furnishing of essential utility services. We shall not be the first court to turn that preference on its head.

## III

We turn to the scope and effect of our holding. While we void the perpetual guarantee of disposal capacity in paragraph 4 of the TSD-Trimont agreement, we do not set aside the agreement in its entirety. As we have noted, section 6823 expressly authorizes TSD to contract to supply service outside its boundaries. Paragraph 12 of the agreement in question contains a severability clause providing, "In the event that any part or provision herein contained in this Agreement or incorporated herein, be found to be illegal or unconstitutional by a court of competent jurisdiction, such finding shall not affect the remaining parts, portions or provisions hereof."

Provided the subject of a contract is within the power of a governmental body, a contract between a governmental body and a private party is to be construed by the same rules which apply to the construction of contracts between private persons. (See *Pacific Architects Collaborative v. State of California* (1979) 100 Cal.App.3d 110, 123 [166 Cal.Rptr. 184], and authorities cited therein.) "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599; *South Tahoe Gas Co.* v. *Hofmann Land Improvement Co.* (1972) 25 Cal.App.3d 750, 757 [102 Cal.Rptr. 286].) Here, the TSD-Trimont contract contains at least two distinct objects: (a) the furnishing of sewage disposal capacity to Trimont and (b) the furnishing of a guaranteed amount of capacity. While we must strike down the latter object as unlawful, the former may remain enforceable.

TSD has never suggested it wishes to provide service to Trimont on a basis different from the way it serves its inhabitant members, i.e., on a "first come, first served" basis. Consequently, we do not reach the substantial question of whether a sanitary district might have the power to allocate unused capacity on other than a "first come, first served" basis in the event of a shortage of capacity.[21] (Compare *Morrison Homes Corp.* v. *City of Pleasanton, supra,* 58 Cal.App.3d at pp. 733-734, with *Carlton*

---

[21]At trial, Dart objected to any determination of its rights as against TSD, contending that, in this litigation, Dart and TSD were not adversaries but were rather codefendants asserting a common position against Trimont. Moreover, Dart indicated that those rights were the subject of separate litigation between Dart and TSD. We view Dart's objection as well taken. The issues at trial in the instant case focused on Trimont's guarantee, not on Dart's contract with TSD. We have an inadequate record on which to evaluate Dart's contract, the way in which TSD has or has not complied with it, and any unfilled need for service by Dart, particularly in light of our dissolution of the injunction in this case. If, in fact, Dart has a problem with obtaining service from TSD, we presume the parties will reach a sensible accommodation, or, failing that, litigate the issue in an action that will supply an adequate record for review.

*Santee Corp.* v. *Padre Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14, 26 [174 Cal.Rptr. 413]; see *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 446-447 [189 Cal.Rptr. 346, 658 P.2d 709].)

IV

We tie up a last loose end related to the deed to Trimont's 50 acres of land that Trimont deposited with the court. As we have noted (*ante,* p. 336), part of the consideration for the 1971 agreement was that Trimont would convey title to the 50 acres to TSD upon request; the land could be purchased by Trimont or County.

Our resolution of this litigation leaves Trimont with substantial benefit from the agreement, in the form of service already provided by TSD and, presumably, in the form of service to be provided in the future on a "first come, first served" basis. But our invalidation of the guarantee means that Trimont got less than it bargained for. It is possible that some equitable adjustment should be made.

We are aware of the rule that " 'contracts wholly beyond the powers of a municipality are void. They cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in *quasi* contract can be had for work performed under them.' " (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 88 [124 P.2d 34, 140 A.L.R. 570], quoting *Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 353 [291 P. 839, 71 A.L.R. 161].) The rule has been applied to prohibit private parties from recovering the value of work, goods, or services supplied to a public entity pursuant to a contract. (See *Reams* v. *Cooley* (1915) 171 Cal. 150 [152 P. 293]; *Zottman* v. *City and County of San Francisco* (1862) 20 Cal. 96.) Where the private party contracting with the public entity has acted in good faith, and where the contract in question is declared invalid because of a lack of power of the public entity to contract for an otherwise legitimate purpose, and where the public entity has received consideration that may be returned to the private party in kind, the foregoing rule, denying recovery to the private party, has been abandoned on the ground that it is unduly harsh and inequitable. (See *Normandy Estates Metropolitan Rec. Dist.* v. *Normandy Estates, Ltd.* (1976) 191 Colo. 292 [553 P.2d 386, 389-390]; 10 McQuillin, Municipal Corporations (3d ed. 1981) § 29.127, pp. 568-569.) Thus in *Normandy,* a recreation district acquired a swimming pool and related facilities pursuant to a contract declared unlawful (for failure to submit the indebtedness of the district to the voters) after the district had paid a private party somewhat less than half the agreed purchase price. The Colorado Supreme Court held the district could either pay the balance of the purchase price and retain the facilities or return the facilities to the

private party upon refund to the district of amounts received by the private party. (*Normandy, supra,* 553 P.2d at p. 390.)

Here, we need not go so far as *Normandy.* TSD has not received the consideration in dispute; title to the 50 acres of property has never been conveyed to the district. To the extent that TSD seeks a conveyance of the entire 50 acres, TSD asks that Trimont furnish consideration arguably attributable (in part at least) to the guarantee of disposal capacity declared ultra vires. We are unaware of any case that has allowed a public entity to insist on payment of consideration under an ultra vires contract, where the public entity has not furnished the goods or services contemplated by the contract. (Compare *City of Pasadena* v. *Estrin* (1931) 212 Cal. 231, 236 [298 P. 14] [city entitled to recover for market value of potatoes actually furnished to private party pursuant to ultra vires contract].) We conclude the rule prohibiting recovery by a private party for goods or services furnished to a public entity pursuant to an ultra vires contract has no application here.

*City of Vernon* v. *City of Los Angeles* (1955) 45 Cal.2d 710 [290 P.2d 841], is a helpful precedent. There, the two cities entered into a series of agreements between 1909 and 1938 by which Los Angeles would treat and dispose of Vernon's sewage. The Los Angeles sewer system eventually became overloaded and the state ultimately filed an abatement action in 1943. The net effect of the abatement action was that Los Angeles was required to build a new plant and related facilities at a cost of some $41 million, with annual maintenance costs of about $500,000. Vernon sued to compel Los Angeles to continue disposing of Vernon's sewage at rates set forth in the agreements between the cities. However, the trial court entered judgment against Vernon, on the theory, inter alia, that Los Angeles' performance had been legally impracticable when judgment was entered in the abatement action because of the unanticipated enormous increase in costs of the new sewer facilities.

Upholding the trial court on its theory of impracticability, the Supreme Court approved an equitable adjustment between the parties: "Despite the language that the contracts are 'terminated' and 'invalid,' the effect of the judgment herein is not to determine that when performance by one party became impracticable the contracts were altogether abrogated regardless of what performances had already been rendered by either party. Such a determination would be incorrect. (See *Ogren* v. *Inner Harbor Land Co.* (1927), 83 Cal.App. 197, 199 [256 P. 607].) More accurately, the judgment determines that certain described 'facilities and rights' created under the contracts (such as the gauging stations and relief sewer provided for by the 1938 contract) can and should be salvaged, and although the case was not

tried in such a way that all obligations between the parties could be precisely adjusted by the judgment herein, such judgment expressly contemplates an adjustment of those obligations; it decrees that Vernon is liable to Los Angeles for any monetary obligations accrued under the contracts prior to the entry of judgment in the abatement action, 'provided, however, that if all the benefits received by her from the City of Los Angeles under all said agreements prior to the entry of said judgment in said State Abatement Action have had a fair value less than the total payments made by her and those now owing to the City of Los Angeles, she, Vernon, shall be credited with such excess of payments over such value of benefits received.' " (*City of Vernon* v. *City of Los Angeles, supra,* 45 Cal.2d at p. 721, fns. omitted.)

Here, on remand, the trial court shall balance the benefits received and reasonably to be received by Trimont and County from the 1971 agreement against the consideration called for in the agreement. In performing that task, the trial court shall consider, inter alia, the extent of benefits received to date by Trimont and reasonable benefits to be received in the future even in the absence of the void guarantee. If the trial court concludes that there exists a disparity between the consideration called for by the contract and benefits reasonably received or to be received, the trial court shall make an equitable adjustment by allowing title to the 50 acres of real property to remain with Trimont or by requiring Trimont to deed only a part of the 50 acres to TSD. We do not mean to suggest that any disparity between benefits and consideration necessarily exists.

### V

The judgment is reversed and the permanent injunction heretofore entered is dissolved. The matter is remanded to the trial court for further proceedings described in part IV, above. Each side shall bear its costs of suit on appeal.

Puglia, P. J., and Blease, J., concurred.

A petition for a rehearing was denied August 24, 1983.