[Civ. No. 20113. Third Dist. Jan. 28, 1983.]

ROD WELCH, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Stark, Stewart, Wells & Robinson, Robert C. Field and R. Gordon Baker, Jr., for Plaintiff and Appellant.

Cox, Castle & Nicholson, James P. Watson, George M. Cox and David C. Wheeler as Amici Curiae on behalf of Plaintiff and Appellant.

Robert T. Carlson, Richard G. Rypinski, Ralph E. Livingstone, Jr., and Stephanie G. Sakai for Defendant and Respondent.

## OPINION

**BLEASE, Acting P. J.**—Plaintiff Rod Welch, doing business as Rodwelch Company, appeals from a judgment in favor of defendant State of California (State) following a court trial. The action arose out of a contract between Welch and the State Department of Transportation (CALTRANS) to repair a damaged portion of the Benicia-Martinez Bridge.

In January 1975, a ship collided with and destroyed the pier 11 fender of the Benicia-Martinez Bridge.[1] On March 18, 1975, CALTRANS opened the bidding for repair of the fender, with a published bid range between $550,000 and $650,000. Welch submitted a bid of $586,442, and two other general contractors submitted bids of $606,880 and $672,408, respectively.[2] As the lowest bidder, Welch was awarded the repair contract on March 21, 1975.

The contract called for removal of sunken fender segments, removal and replacement of damaged concrete piles, and construction of a new fender. High tides and strong currents, however, interfered with work at the site, resulting in delays and significantly greater costs than Welch had anticipated. The currents limited diving to approximately one hour per shift, as opposed to the two or three hours Welch had estimated. As a result, the removal of sunken debris was severely hindered. The currents also made it difficult and time consuming to position and secure the piles which supported the fender. The higher-than-expected tides also induced Welch to alter the method of construction. Rather than pouring the concrete ring beam in place as contemplated, Welch ultimately decided to partially precast it in sections. Building the beam in segments required, among other things, more precise positioning of piles and the use of more reinforcing steel to overlap the segments. Welch also had to rent a casting yard, further increasing his costs.

---

[1] The fender consisted of a concrete beam supported by piles which surrounded the pier to protect it from damage by colliding ships.

[2] Prior to the bidding, the State's confidential estimate of the cost of repair, including the contractor's profit, was $639,930. Added to this amount was a 15 percent contingency of $95,970, or a total of $735,900, for unforeseen costs as well as uncertainties in the method of estimating.

In this action, Welch seeks contract damages for these unanticipated costs of construction, for losses in profits, and for loss of an advantageous competitive position in the industry because he was misled by incorrect tide data in the construction plans supplied by CALTRANS to bidders on the project. In a separate cause of action, he claims he was misled by the State's failure to disclose information in its possession regarding a similar fender repair project in 1969 of pier 10, only 528 feet away and a part of the same bridge.[3]

The trial court concluded the State was not liable either for misrepresentation or nondisclosure and entered judgment in its favor. On appeal, we consider separately the State's liability for affirmative misrepresentation and for nondisclosure, although the two causes of action involve interrelated issues. We shall reverse the judgment insofar as it precludes liability for nondisclosure in combination with the State's affirmative and misleading representation.

## I

■ "A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented." (*Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338].) Since tort actions for misrepresentation against public agencies are barred by Government Code section 818.8, however, the rule is "based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (*Id.*, at pp. 510-511; see also *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 293-294 [85 Cal.Rptr. 444, 466 P.2d 996].)

Here, a general note contained in the plans which CALTRANS provided to bidders set forth the following tide data:

MHHW—El. +2.35
USC & GS Mean Sea Level Datum of 1929 ± El. 0.00
MLLW—El. − 2.35

The MHHW, or mean higher high water, is the average elevation in feet above mean sea level of the higher of the two high tides that occur each day. The MLLW, or mean lower low water, is its counterpart. Both the MHHW and MLLW figures given in the note were erroneous. The State concedes the

---

[3]Testimony by State witnesses indicated, however, that pier 10 was only 120 feet away from pier 11.

MHHW figure should have been plus 3.40 feet, and the trial court found the error in MHHW elevation was a material misrepresentation.[4]

The materiality of the erroneous MHHW datum is not seriously disputed on appeal. (Cf. *Jasper Construction, Inc.* v. *Foothill Junior College Dist.* (1979) 91 Cal.App.3d 1, 11 [153 Cal.Rptr. 767].) Expert testimony established that a MHHW datum conveys information that the highest tide each day will occur, on an average, approximately half the time above and half the time below that elevation. Since the bottom of the concrete fender as depicted on the State-supplied plans was at an elevation of plus 2.5 feet, the more-than-a foot discrepancy in the MHHW figure of between plus 2.35 feet and the correct plus 3.40 feet obviously affected how long the structure would be submerged on any given day. As a general proposition, the more often a contractor's waterfront work is submerged under water, the more expensive the structure becomes for him to build. With respect to the particular project in question, an error of 1.1 feet in the MHHW would be significant in terms of the cost of construction.

Additionally, the mathematical difference between the MHHW and the MLLW constitutes the diurnal, or tidal, range. Expert testimony established a clear relationship between diurnal range and current conditions; all other factors being equal, the rate of current flow will increase at a much faster rate as the diurnal range increases. The diurnal range also bears an inverse relationship to slack water, a time period associated with a tidal change, when underwater diving is optimal because there is little tidal flow. All other factors being equal, the slack water time decreases as the diurnal range increases.[5]

Although the contract between CALTRANS and Welch contains a provision requiring on-site inspection by contractors as well as other general disclaimers of warranty, it does not absolve the State from responsibility for positive and material misrepresentations contained in the plans and upon which a contractor had a right to rely. (*Wunderlich* v. *State of California* (1967) 65 Cal.2d 777, 783 [56 Cal.Rptr. 473, 423 P.2d 545]; *E. H. Morrill Co.* v. *State of California* (1967) 65 Cal.2d 787, 792-793 [56 Cal.Rptr. 479, 423 P.2d 551]; see also Cal. Construction Contracts and Disputes (Cont.Ed.Bar 1976) § 4.20, pp. 180-182.) There is no provision in the contract specifically disclaiming any responsibility on the part of the State for the accuracy of the tide data contained in the general note. (See *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d at p. 292.)

---

[4]The correct MLLW datum is unclear from the record. According to the State, it should be minus 2.40 feet but, according to Welch, it is minus 2.50 feet.

[5]It is general practice in the industry for the design engineer to place tidal information on plans for any waterfront construction where such information is pertinent to the problems which may be encountered in building the structure.

■ Rather, the focus of the dispute with regard to the State's liability for furnishing incorrect tide data in the plans is whether Welch relied on the misrepresentation and whether that reliance was reasonable. (See *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d at pp. 292-293.) Since the trial court resolved these issues on contested evidence against Welch, we will not disturb those factual determinations on appeal. (See *ibid.*)[6] Nonetheless, we do recite in some detail the evidence pertinent to the question of Welch's justifiable reliance on the erroneous tide data and the trial court's treatment of that evidence because, as we shall explore in discussion II, the factual background is important to an assessment of the State's liability for non-disclosure.

At trial, Welch introduced job site drawings and other bidding documents upon which he had noted and at least considered the MHHW and MLLW figures provided by the State. Welch also testified that he would not have submitted a bid for the pier 11 work had he known that the true diurnal range at the site was 5.9[7] instead of 4.7.

In preparing his bid, Welch examined the pier 11 site from the railroad bridge located about 50 feet away and observed nothing to indicate the general note figures were in error. He did not make an independent investigation of the tidal conditions or attempt to verify the information in the general note.

Welch, instead, claimed to have deduced a great deal of information from the tidal data in the plans from his prior work experience on the Sacramento and other rivers which are affected by tides. Regarding the height of the high tides at the site, he reasoned that since the bottom of the ring beam was slightly (two inches) above MHHW, the high tides could only rise onto the structure "for plus or minus 2 hours, on fewer than half of the days." He calculated that the structure would be partially submerged "only about 3% of the time." Moreover, since higher high tides occur during the late evening and early morning in the summer, the water could be expected not to rise onto the fender during a normal working day.

Welch also claimed to have deduced information about current and slack time. He testified that "[s]lack time . . . is a function of the current and it is a function of the tide and it is a function of the tide range. It is the tide range that causes the flow of water, the current, to exist. Without a tide range—that is, if the difference between mean high high water and mean low low water, for ex-

---

[6]We reject Welch's arguments that the provisions of the contract conclusively or presumptively established his justifiable reliance and that submission of a reasonable bid for the work as represented by the State necessarily established such reliance.

[7]Or 5.8—see footnote 4, *ante.*

ample, was zero, there would be no current, there would be no problem. [¶] As the tide range begins to increase, the current picks up. It is a function of the size of the tide. It is a function of some other things as well: Hydrographics, shape of the basin you are talking about, the width of the basin, the depth of the water. It is a function of other things. It is a function of the geography. But, based on our experience in working on the river and so forth; prior to that having worked in what we considered reasonably comparable circumstances; there was simply no reason to believe that, given those tide conditions, there would be any down time. [¶] . . . If they had shown the correct tide elevations, it would have been clear first and foremost that the water was above the structure, and that this would be a significant problem with respect to tide work and, without any question, it would have led to a more detailed analysis of that problem. [¶] But in any case, there was no indication that the tide would interfere in the work. Based on those figures, and my previous experience, we believed the tide wouldn't interfere at all. And since we only needed two and a half hours, and we didn't need the full eight hours, we thought there couldn't possibly be a problem . . . ."

The trial court apparently did not believe Welch relied on the general note to the extent that he claimed and considered Welch's deduction process to be a *post hoc* rationalization, though not mendacious. The court instead was persuaded by the testimony of Ray Neatherlin, Welch's construction superintendent. Neatherlin testified that he met with the State's resident engineer in early April 1975, soon after Welch was awarded the contract. The engineer advised Neatherlin then that Welch might want to consider precasting portions of the ring beam, as that method had been employed in a 1969 reconstruction job on pier 10. The next day he showed Neatherlin some sketches of the pier 10 precast as well as pictures of the debris removal. On April 7, after visiting the site at high tide and being surprised to find the water swirling around inside the pier 10 fender above the bottom of the ring beam, Neatherlin informed Welch of his observations and of the State's suggestion to precast the ring beam on pier 11. Welch rejected the suggestion, saying that they had "bid [the job] cast in place and that's the way that [they] were going to build it." The next day, Neatherlin returned to pier 10 and found the water even higher. He reported again to Welch, who this time authorized Neatherlin to obtain a copy of the precast details from the pier 10 project.

Later, Welch sought and ultimately received approval to construct the ring beam by the precast method in early June. It was not until August 25, 1975, however, that Welch first notified the State of his belief that the plans contained inaccurate tidal information and of his intention to make a claim for additional costs. On November 4, 1975, Welch completed the contract work and the State accepted his performance.

Although the trial court recognized that the events occurring in early April and thereafter were obviously subsequent to the contract award for the pier 11 repair on March 21, 1975, it viewed Welch's initial response to Neatherlin's expression of concern about the tide as negating an inference that Welch was in fact relying on the State's representation of tidal conditions at the time of the bid. Said the court, "can it really be said that [Welch] relied on the tide information set forth on the plans when he chose to ignore Mr. Neatherlin's research, concern and observations relating to high water and current in the construction of the fender for Pier 10. Is it not reasonable [instead] to find that plaintiff was utilizing his own judgment and experience . . . ?"[8]

On the issue of the reasonableness of Welch's reliance, the State introduced evidence that a reasonable contractor, instead of relying only on average elevations when bidding, would ascertain *specific* elevation maximums to be encountered during the period of construction. Tide tables which give the time of high and low tide elevations on a given day for specific locations are readily available in most bait shops, and two estimators for the losing bidders on the pier 11 project testified that they had consulted tide tables for the period of construction in question and were not misled by the general note. They used the MLLW instead of the MHHW figure in connection with their use of tide tables. One expert also opined that he would expect a reasonable contractor to utilize tide tables in submitting a bid. On the other hand, Welch presented expert testimony that a contractor, when bidding, ordinarily is not concerned about tides on a particular day but only with averages during a construction period; once the contractor is awarded the job, he then uses the tide tables to schedule the work. Accordingly, a contractor submitting a bid could expect to rely on average tide data contained in a general note without consulting a tide table.

The trial court apparently embraced the State's evidence as the more credible, for it found that the "General Note conveyed little if any information concerning the maximum tidal elevations . . . to be encountered at the job site." On appeal, we are bound by this inference that the court drew on contested evidence. (See *Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602 [86 Cal.Rptr. 829].) We only note for purposes of later discussion that, although reliance on the general note data *alone* may not have been justifiable, the erroneous data certainly could have been misleading to a reasonable contractor in assessing maximum elevations at the site.

In concluding that Welch's reliance would not have been justified, the trial court also found that the general note "conveyed no information as to current

---

[8]One also may question, if there were actual reliance, why Welch waited so long to notify the State of the error in tide data. The delay may be explained to some extent by expert testimony that more than a month of daily experience with the tides would be required before a person would be confident of the inaccuracy of *mean* tide data.

conditions to be encountered at the job site . . ." and "did not convey sufficient information as to slack water conditions, a crucial element in the formulation of the bid . . . ." As we have previously discussed, however, uncontradicted expert testimony established a clear relationship, though complex, between diurnal range, extrapolated from the MHHW and MLLW figures, and current conditions. Although two of the State's witnesses testified that they did not believe current depended upon diurnal range, they both later admitted the relationship between the tide range, the currents, and slack time.

What was established by the experts and apparently considered important to the trial court in making its findings was that the rate of current or the amount of slack water time cannot be determined from diurnal range *alone.* The amount of current and period of slack water time is dependent as well on the topography of a particular location and, to a lesser extent, on such factors as "spring" and "neap" tide phenomena and seasonal variations in river flow.[9] Like tide tables, current tables also are available locally; they tell when a slack water period will occur but do not indicate how long that period will last.

We conclude that the trial court, as fact finder, was within its discretion in inferring from the evidence that Welch's sole reliance on the general note without further independent investigation was unreasonable. However, a finding of unjustifiable reliance does not preclude an inference that the general note figures were misleading as to current and slack water conditions.

## II

Welch also contends that, in addition to misleading him by its positive misrepresentation as to tidal elevations, the State further misled him by its failure to disclose to him information in its possession relating to the prior pier 10 reconstruction project.

▮ Under certain circumstances, a governmental agency may be liable for failing to impart its knowledge of difficulties to be encountered in a construction project. (See *City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 222 [57 Cal.Rptr. 337, 424 P.2d 921]; *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d at pp. 293-294.) As the Supreme Court observed in *Warner,* "a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which

---

[9]Given the topography of a particular location, however, current flow generally will increase in greater proportion as the diurnal range increases. The relationship is basically one of the volume of water going past a given cross-section of land. In the opinion of one expert, a bidder's use of MHHW and MLLW figures on a general note as an indicator of general current conditions would be reasonable.

render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (*Id.,* at p. 294, fns. omitted; see also generally Annot., Public Contracts—Duty to Disclose (1978) 86 A.L.R.3d 182.)

■ The State reads the above language in *Warner,* incorrectly, as setting forth three separate elements which are necessary before liability attaches against a public agency for nondisclosure. Even though *Warner* clearly refers to three independent situations in which liability may be imposed (see also generally 4 Witkin, Summary of Cal. Law (8th ed. 1973) Torts, §§ 462-464, pp. 2726-2728), the trial court apparently succumbed to the same misunderstanding, for it concluded that the State was not liable to Welch for "fraudulent concealment" because he "failed to prove that [CALTRANS] actively and intentionally concealed Pier 10 information." The court characterized the State's failure to disclose information as "careless" rather than intentional and rejected Welch's argument that, independent of any intent to conceal, a cause of action may arise for mere nondisclosure "when combined with statements of facts which are likely to mislead in the absence of such further disclosure . . . ." (See *Sanfran Co.* v. *Rees Blow Pipe Mfg. Co.* (1959) 168 Cal.App.2d 191, 204 [335 P.2d 995].)

The trial court's error of law requires reversal. It is well established that, in a tort context, the "supression of a fact by one . . . who gives information of other facts which are likely to mislead for want of communication of that fact . . ." is actionable. (Civ. Code, § 1710, subd. 3; *Sanfran Co.* v. *Rees Blow Pipe Mfg. Co., supra,* 168 Cal.App.2d at p. 204; see also Rest.2d Torts, § 551, subsec. (2), cl. (b), com. g, pp. 119, 121-122.) In such context, there is no requirement of proving an affirmative fraudulent intent to conceal. (*Ibid.*) The same premise applies logically to public construction contracts where liability is based on breach of an implied warranty instead of a tort theory. (See *Christie* v. *United States* (1915) 237 U.S. 234, 239-242 [59 L.Ed. 933, 935-936, 35 S.Ct. 565].) Hence, the State had a legal duty to disclose pier 10 information if to do so would have eliminated or materially qualified the misleading effect of the misrepresentation in the general note.

In the present case, the two repair projects were conceded by the State to be "substantially identical," and the trial court found them to be "substantially similar." Undisputed evidence reveals that, in preparing bid specifications for reconstruction of the pier 11 fender system, the State utilized plans and records from similar work performed in 1969 on the damaged pier 10 fender of the same bridge. The adjacent piers were only about 120 feet apart (see fn. 3, *ante*), and the reconstruction plans for the pier 10 and pier 11 fenders were essentially the same. Although the State knew that tidal and current conditions

were the same at pier 10 and pier 11, one significant change which was made in the pier 11 plans was the addition of the general note containing the erroneous tide data.

The same State engineering team that had managed the pier 10 reconstruction was assigned to design and manage the pier 11 project. They estimated the costs of replacing pier 11 by considering the amount actually paid on the pier 10 project adjusted for inflation, the time the pier 10 work required, as well as the knowledge the State had gained about actual tidal conditions from the pier 10 project. In particular, the State had awarded the underwater removal of the fender debris from pier 10 on a force account basis[10] because, even after consulting with private contractors, it did not have sufficient knowledge to enable it to estimate the difficulty and cost of such work. However, the pier 11 debris removal was not awarded on a force account basis because the State had available the cost account records on the pier 10 project. The State also was aware that there had been a 70-day overrun on the pier 10 project when estimating costs of the pier 11 project.

As well, the State possessed daily diaries from the pier 10 reconstruction. These records showed that progress on the earlier project was hampered by "extremely high tides" and current problems. Because of high tidal elevations, the ring beam was precast rather than cast in place. During the construction process, large precast units broke loose and fell into the bay; a diver who attempted to salvage these units was trapped beneath them and drowned.

A final report also had been prepared on the pier 10 project and was utilized by State engineers in planning the pier 11 project. This report disclosed, inter alia, that the debris removal had been awarded and paid for by a force account and had cost the State approximately $202,000,[11] and that the State had permitted the ring beam to be precast.

The bidding documents on the pier 11 project made no reference to the pier 10 project and in no way indicated the existence of any document reflecting tidal or current conditions at the site. It was the State's policy to provide information about comparable projects to bidders only if the other projects were "at the same location" and not to "volunteer" any other information to bidding contractors. Pursuant to this policy, the State's engineers would have shown Welch the pier 10 documents only if he had specifically asked for them.

---

[10]The contractor is paid his actual costs plus a profit.

[11]Welch testified he had estimated the debris removal on the pier 11 project would cost $80,860. The State's confidential estimate for the same removal was $266,400.

On March 13, 1975, Welch met with a CALTRANS engineer and asked for any information which would be helpful in preparing his bid. The engineer showed Welch the plans of the original bridge, plans of the pier 11 fender as originally built, and the State diver's report of the location of the debris; he, however, did not inform Welch of the pier 10 project or of the existence of any documents which might bear upon the tidal conditions at the job site. Since Welch did not know and was never informed of the existence of the pier 10 reconstruction, he never specifically asked for or obtained the relevant documents.

Only one of the bidders on the pier 11 project *did* obtain information about the pier 10 project from the State, apparently because he expressly asked for such information. He was shown the pier 10 final report and discussed it, the debris removal, and the diving conditions with a State engineer. From these disclosures, the bidder knew the actual cost of removing the sunken fender debris, the amount of time required to complete the debris removal, and the equipment used to do it. He also learned that the State had allowed the fender beam to be precast.

The materiality of the tidal and current information the State possessed on the pier 10 reconstruction is manifest. Such information certainly would have assisted Welch and other prospective bidders in formulating their bids on the pier 11 project. Indeed, the single bidder who obtained the information testified that it was very helpful in formulating his bid on the pier 11 work; he said he had no other way of confidently estimating the cost of the debris removal. The State engineers also recognized that they did not have sufficient knowledge enabling them to estimate the difficulty and cost of debris removal prior to their pier 10 experience.

The nondisclosure of the information on the pier 10 project looms as all the more significant since the trial court's reason for finding Welch could not have justifiably relied upon the inaccurate tide data in the general note was its observation that critical information with regard to current and slack water conditions was omitted form the bid specifications. The undisclosed information doubtless would have qualified or cast doubt upon any false impression of favorable tide conditions given by the tide data in the general note. The failure to disclose such information compounded the effect of misleading half-truths in the general note. (See *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d at p. 294.)

The Supreme Court's decision in *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d 285, is factually similar to the present case. In *Warner,* the City of Los Angeles provided bidders on a retaining wall construction project the logs of two test borings it had conducted at the job site; the logs

erroneously reported the soil composition obtained from the borings. (*Id.*, at p. 291.) Attached to the logs was a caveat disclaiming any warranty that the test hole information was indicative of conditions elsewhere at the site. However the city knew but did not disclose that cave-ins had occurred in both test holes, forcing it "to change its drilling methods and to abandon the holes before reaching the planned depth of 50 feet." (*Ibid.*) After the contract was awarded and construction began, caving occurred in holes which were drilled, and the contractor was forced to change to a more expensive drilling technique with rotary mud. The city was held liable for its nondisclosure of the earlier cave-ins and use of special drilling techniques because such nondisclosure "transformed the logs into misleading half-truths." (*Id.*, at pp. 294-295.)[12]

The trial court's finding that Welch did not actually rely on the positive misrepresentation in the general note does not preclude a finding of reasonable inducement to enter the pier 11 contract because of the nondisclosure of the pier 10 information to which the misrepresentation related. (See *Sanfran Co.* v. *Rees Blow Pipe Mfg. Co., supra,* 168 Cal.App.2d at pp. 201-202.) Here, the evidence suggests that Welch would not have entered the contract with the State had disclosure of the pier 10 documents been made. (See *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, 191 [183 Cal.Rptr. 881].) It is undisputed that Welch did not know the severity of the tidal currents and elevations when he bid on the project. He testified that, had he been aware of the pier 10 documents, he would have examined them and learned the extent to which the currents and tides adversely affected that job. With such knowledge, he would not have bid on the pier 11 job.[13]

Welch maintains that Government Code section 14270 (now Pub. Contract Code, § 10120) imposes a broader obligation on the State to disclose "complete" information irrespective of whether the State has affirmatively made misleading representations or partial disclosures. That section provides: "Before entering into any contract for a project, the department shall prepare full, complete, and accurate plans and specifications and estimates of cost, giving such directions as will enable any competent mechanic or other builder to carry them out." Because reversal is required on the more limited ground,

---

[12]In a petition for rehearing, the State argues that the tidal datum contained in the general note was not a "misleading half-truth" because it was "completely erroneous," and hence the *Warner* case is inapposite. It however misreads *Warner,* where the facts disclose that the logs of the test hole borings did erroneously misrepresent soil conditions at the site. (*Id.*, at p. 294.) After concluding that the jury could have found the city liable for "material" misrepresentation upon such facts (*id.*, at pp. 292-293), the *Warner* court went on to hold that further non-disclosures could have "transformed the logs into misleading half-truths." (*Id.*, at p. 294.) Thus, half-truths are inclusive of erroneous representations and vice versa when assessing liability for nondisclosure.

[13]On appeal, we do not resolve the factual question of reasonable inducement, since it is more appropriately within the province of the trial court on remand.

however, we do not reach this question. (But see *Wiechman Engineers* v. *State of California* ex rel. *Dept. Pub. Wks.* (1973) 31 Cal.App.3d 741, 748-753 [107 Cal.Rptr. 529]; *Jasper Construction, Inc.* v. *Foothill Junior College Dist.*, *supra*, 91 Cal.App.3d at pp. 10-13.)[14]

### III

The State contends that the judgment in its favor is justified on the ground that Welch failed to give timely notice of his potential claim as required by the repair contract. The trial court, however, declined to make a finding on this theory and, since the evidence on the issue was in dispute, we do not entertain it on appeal. (See *Cline* v. *Yamaga* (1979) 97 Cal.App.3d 239, 246-247 [158 Cal.Rptr. 598].)

The judgment is reversed in that it precludes liability for nondisclosure of material facts and the cause is remanded for further proceedings in accord with the views expressed in this opinion.

Reynoso, J.,* and Warren, J.,* concurred.

A petition for a rehearing was denied February 25, 1983, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 23, 1983. Reynoso, J., did not participate therein.

---

[14]Liability may also attach where a defendant has superior or exclusive knowledge of undisclosed material facts. (See *Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d 285; and generally Annot., *supra,* 86 A.L.R.3d 182.) Although Welch maintains on appeal that tide and current information, in the form of the pier 10 documents, was within the exclusive possession of the State, we decline to reach the contested factual question whether such information was so much more accessible to the State as to constitute an independent basis for liability. The trial court did not make a finding on this issue. Similarly, we do not reach the related issue whether the State had an independent duty to disclose pier 10 documents to all bidders after it did so to one.

*Assigned by the Chairperson of the Judicial Council.