[No. A031452. First Dist., Div. Three. Jan. 13, 1987.]

TONKIN CONSTRUCTION COMPANY, Plaintiff and Respondent, v. COUNTY OF HUMBOLDT, Defendant and Appellant.

COUNSEL

Robert D. Curiel, County Counsel, and William J. Losh, Jr., Deputy County Counsel, for Defendant and Appellant.

Francis B. Mathews and Mathews & Mathews for Plaintiff and Respondent.

OPINION

MERRILL, J.—Respondent Tonkin Construction Company (Tonkin) filed a "complaint for money due" against appellant County of Humboldt (County) for failure to perform certain representations and agreements implied in the parties' written contract. Following court trial, Tonkin was awarded $27,276.08 in damages against the County. The County appeals, arguing that the record does not support a finding of its liability to Tonkin. We affirm the judgment.

I

In September 1983, the County and the United States Army Corps of Engineers (Corps) undertook to restore the shoreline in a portion of Humboldt Bay. In connection with this objective, the County and the Corps agreed that the County would be responsible for having a seawall built and that the Corps would be responsible for having backfill work performed behind the wall. Such backfill work was necessary for the support and protection of the wall.

The County submitted the contract for the construction of the seawall, entitled the "King Salmon Shore Protection Project, Phase One," to bidders. Tonkin was the successful bidder on the County's contract. In turn, the Corps contracted with a dredging company, Osburg, for the performance of the backfill work.

The seawall was to be approximately 1,200 feet in length. The County and the Corps determined that construction of the first 500 feet of the seawall would be completed by October 15, 1983. After the first 500 feet were constructed, Osburg was to have performed the necessary backfill work on that portion. Thereafter, Tonkin would complete construction of the remainder of the seawall.

The contract provided that Tonkin was to begin work within 10 days of its receipt of the County's notice to proceed. The seawall was to be completed 40 days from the date Tonkin began work. For each day of delay beyond

the 40th day of work, Tonkin was obliged to pay the County $500 per day in liquidated damages. The contract's progress schedule set forth that at least 500 feet of the timber bulkhead wall was to be constructed by October 15, 1983, and that Tonkin was to pay the County $2,000 per day in liquidated damages beginning October 16, 1983, until the first 500 feet of the wall were completed.

Additionally, the contract included the following provision: "It will be necessary to coordinate scheduling of the various phases of work on this project with the [United States Army] Corps of Engineers since dredge material necessary for backfill of the wall and support fill for the anchor footing will be provided by their Contractor."

Tonkin received the County's notice to proceed on September 15, 1983, and it commenced work on September 19, 1983. By October 16, 1983, Tonkin had completed the first 500 feet of seawall. However, despite constant communication with the Corps, Osburg did not arrive with its dredge to perform the necessary backfill work. For this reason it became necessary for Tonkin to haul rock and gravel out to the seawall to protect it from damage by tidal action and storms. In addition, Tonkin had its personnel regularly checking the wall for damage. Tonkin also was required to keep equipment stationed at the construction site for the purpose of making necessary repairs.

The dredge finally arrived in December 1983. It was not in full operation, however, until April 1984. The seawall was completed sometime after April 1984.

## II

It is the County's position that liability for extra work done by Tonkin cannot be established, as the contract for the construction of the seawall contained no actual misrepresentation with respect to the availability of the dredge. The County contends that implied representations cannot be the basis of its liability. The County further argues that, in any event, the contractual provision referring to the necessity of Tonkin and the Corps to coordinate scheduling of various phases of work constituted a disclaimer as to the exact time of the dredge's arrival. These contentions are not borne out by the law.

■ A contract between a governmental body and a private party is to be construed by the same rules which apply to the construction of contracts between private persons (*Trimont Land Co.* v. *Truckee Sanitary Dist.* (1983) 145 Cal.App.3d 330, 355 [193 Cal.Rptr. 568]), and the public entity is bound

in the same manner as an individual (*Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338]). ■ One such rule of contract interpretation is that a contract includes not only the terms that have been expressly stated but those implied provisions indispensable to effectuate the intention of the parties. (Civ. Code, § 1656; *Sacramento Nav. Co.* v. *Salz* (1927) 273 U.S. 326, 329 [71 L.Ed. 663, 665-666, S.Ct. 368].)

The rule establishing a public entity's liability for misrepresentation was set forth by our Supreme Court in *Souza & McCue Constr. Co.* v. *Superior Court, supra,* 57 Cal.2d at pages 510-511: ■ "A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. [Citations.] This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (See also *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 293-294 [85 Cal.Rptr. 444, 466 P.2d 996]; *Welch* v. *State of California* (1983) 139 Cal.App.3d 546, 550 [188 Cal.Rptr. 726].)

■ Clearly an implied term of the contract herein was that once the notice to proceed was issued, the dredge would be available for work on the project. The apparent intention of the parties was completion of the seawall within 40 working days of the issuance of the notice to proceed. Such intention is supported by the various contract terms; i.e., that work shall begin within 10 days of Tonkin's receipt of the notice to proceed, that liquidated damages shall be paid to the County for every day of delay past the 40th day of work and that Tonkin would pay $2,000 per day in liquidated damages from October 16, 1983, until the first 500 feet of the seawall were completed. This intention of prompt completion of the seawall could not have been effectuated absent an implied term that the County would insure the dredge's availability for work on the project. As the contract itself provides, backfill work to be performed by the dredge was necessary to the completion of the seawall.

Tonkin, acting as a reasonable public works contractor, was misled by this incorrect implied representation in its submission of a bid. Tonkin justifiably relied on this representation in determining the cost of constructing the seawall. Accordingly, it did not include in its bid the cost of maintaining the seawall for an indefinite period of time while awaiting the arrival of the dredge. As the County impliedly warranted the correctness of these representations, it is liable for the cost of extra work which was necessitated by the dredge's failure to arrive.

We distinguish the opinion in *Wunderlich* v. *State of California* (1967) 65 Cal.2d 777 [56 Cal.Rptr. 473, 423 P.2d 545], upon which the County places great reliance. *Wunderlich* concerned the state's alleged breach of a warranty with respect to a source of materials available to plaintiff for the construction of a state highway. Included in the contract plans and specifications were results of the state's tests which indicated the quality of the material to be found in various mineral sources convenient to the job site. This memorandum contained no representation as to the quantity of usable source material to be found at the sites. The specifications also contained a disclaimer that the state did not guarantee or accept responsibility for the accuracy of its tests or its interpretation thereof. In addition, the specifications provided that the bidder should carefully examine the job site and that it was assumed the bidder would investigate and satisfy itself as to the conditions to be encountered and the quantity of source material which might be produced. Plaintiff attended the "job showing" at the project site, and reviewed the memorandum which compiled the state's test results from the various sources. Although he was aware that he could also inspect the test reports themselves, he did not and utilized the memorandum alone in choosing the material source. The pit chosen by plaintiff did not produce the required materials, and plaintiff incurred unanticipated costs to complete the required work. (*Id.,* at pp. 779-784.)

The trial court entered judgment for the plaintiff. It found that the state had warranted the content of the chosen pit and that it breached such warranty. The Supreme Court reversed, holding that liability on the part of the state could not be established as the state had not made a positive representation of the material content at the pit. The court reasoned that while the memorandum indicated the quality of test borings results, in fact no representation was made as to the quantity of the material. Further, any representation as to quantity was explicitly disclaimed by the state in the very paragraph containing the alleged warranty. Finally, the court placed great significance upon the fact that the plaintiff in *Wunderlich* chose to rely upon the state's interpretation of the soil tests rather than utilize the opportunity to inspect the reports first hand. Under these circumstances, the court concluded that the plaintiff did not justifiably rely upon the state's representation. (*Id.,* at pp. 784-786.)

Unlike *Wunderlich,* information concerning the availability of the dredge operated by Osburg was information known to the County and not readily available to Tonkin. Whether or not the dredge would be available for backfill work was not information which could be obtained by physical inspection at the jobsite, as in *Wunderlich.*

Furthermore, the facts of the instant case do not reveal an explicit disclaimer with respect to the County's implied representation of the

dredge's availability. ■ Absent a contract provision specifically disclaiming responsibility on the part of the public body for the accuracy of the contested information, general disclaimers of warranty will not absolve the public body from responsibility for positive and material misrepresentations contained in the plans and upon which a contractor had a right to rely. (*Welch* v. *State of California, supra,* 139 Cal.App.3d at p. 551, citing *Wunderlich* v. *State of California, supra,* 65 Cal.2d at p. 783; *E. H. Morrill Co.* v. *State of California* (1967) 65 Cal.2d 787, 792-793 [56 Cal.Rptr. 479, 423 P.2d 551]; and Cal. Construction Contracts and Disputes (Cont.Ed.Bar 1976) § 4.20, pp. 180-182.)

The contract herein merely provided that it would be necessary to coordinate scheduling of various phases of work with the Corps since "backfill of the wall and support fill for the anchor footing will be provided by their Contractor." Rather than constituting a specific disclaimer, this provision further supports the conclusion that the dredge's availability, following issuance of the notice to proceed, was an implied contract term upon which liability for misrepresentation may be established.

The judgment is affirmed.

Scott, Acting P. J., and Barry-Deal, J., concurred.