[No. D018211. Fourth Dist., Div. One. Jan. 24, 1995.]

SAN DIEGO HOSPICE, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO, Defendant and Respondent.

## COUNSEL

Higgs, Fletcher & Mack, John Morris, Michael F. Boyle and Greg A. McAtee for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Scott H. Peters, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**FROEHLICH, J.**—This case again presents the question: when is a comprehensive release enforceable? The San Diego Hospice (Hospice) acquired land formerly owned by the County of San Diego (County), and later discovered the land was contaminated by hazardous materials. Hospice made a claim against County, which claim was settled. The settlement agreement and release contemplated that "[a]dditional pollutants . . . may exist on the

site which have not yet been discovered," but nevertheless released County from all claims "past, present and future, known or unknown, suspected or unsuspected with respect to the site." However, when a second source of contamination was later discovered, Hospice sought to rescind the release. The trial court rejected that effort, and Hospice appeals.

## 1. *Facts*

### A. *The Property*

Between 1880 and 1987 County owned "Vauclain Point" (hereafter the property), and between 1916 and 1920 a hospital was constructed on the property. Sometime around 1929 a high-pressure steam conduit, insulated with asbestos, was built on the property. Also installed on the property was a 2,500-gallon underground storage tank (hereafter the first tank).

The property contained an additional tank (hereafter the second tank) which had been placed on the site sometime prior to 1921. This was a 450-gallon tank which was placed underground adjacent to the kitchen of the old hospital and apparently had held fuel for cooking purposes.

### B. *The Sale and Settlement*

In 1986 County agreed to sell the property to Hospice, and escrow closed in early 1987. At the time the sale closed, Hospice was unaware the property had been contaminated.

In April 1989 Hospice began construction activities, which ceased almost immediately because of the discovery of the asbestos contamination. By August 1989 Hospice had conducted an environmental investigation (including a sonogram of the property) and had discovered additional environmental problems, such as contaminated ash and fuel leakage from the first tank. However, the second tank was not discovered during this period. Hospice filed a damage claim with County for the problems created by the asbestos, the ash and the first tank.

The parties thereafter negotiated a settlement, the agreement of which they executed in late August 1989.[1] The terms of the settlement agreement are crucial. The parties recited that after transfer of the property Hospice had

---

[1]Hospice was under pressure to reach a settlement. Specifically, delaying the project (1) forced Hospice to incur delay costs under its contract with the general contractor, (2) threatened the loss of the project because the conditional use permit was set to expire within six months of the settlement, and (3) caused a major benefactor of the project to inform

"discovered the presence of certain pollutants, contaminants, wastes or hazardous substances on the site . . . . Additional pollutants, contaminants, wastes or hazardous substances may exist on the site which have not yet been discovered."

The parties then recited that Hospice had made a claim against County, that County had denied liability, but that "[i]t is now the intention and desire of the Hospice and the County to fully and finally resolve all disputes that exist or hereafter could arise between them with respect to the site." The agreement required County to pay $435,000 to remedy the asbestos and all costs necessary to abate the ash contamination. In return, Hospice expressly agreed the release was to encompass all claims ". . . past, present and future, known or unknown, suspected or unsuspected, with respect to the site, . . ." and expressly waived California Civil Code section 1542.

### C. *Discovery of the Second Tank*

In the fall of 1990, during construction, the second tank was discovered and removed by Hospice. This second tank had not been reflected on any maps previously given by County to Hospice.

Sometime during 1991, Mr. Dan Johnson (an employee of an environmental consulting firm which had previously done work for Hospice) was working on an unrelated project and examining a packet of maps prepared in 1921 by the Sanborn Map Company. He noticed there was a map of the property depicting an underground storage tank adjacent to the kitchen of the old hospital. He reported his discovery to Hospice.

Some evidence existed to suggest this 1921 Sanborn map derived its information about the presence and location of the second tank from maps on file with County prior to 1921. Mr. William Ring, a County map expert, indicated the 1921 Sanborn map could have been based on or derived from County maps, but that the Sanborn map was not itself a county map. He further indicated he had personally searched County records and had not located any maps showing this underground feature.

### 2. *The Lawsuit*

Hospice's lawsuit against County sought (1) to rescind the release (under several theories, including intentional and negligent misrepresentation and

Hospice it might revoke its grant if the project were unduly delayed. County was aware Hospice was under pressure to resolve the contamination issue.

constructive fraud), and (2) to recover damages from County for the costs of remediation for the second tank. County moved for summary judgment based on the release. It argued: (1) Hospice's claim for rescission lacked merit; and (2) the release was fully effective to bar the damage claims. Hospice filed a cross-motion for summary adjudication, arguing the release was unenforceable due to fraudulent concealment of the second tank or unilateral mistake.

The court granted County's motion and denied Hospice's motion. The court determined the settlement agreement placed Hospice on notice of the potential for other polluting sources to exist on the site, and Hospice nevertheless assumed the risk such sources might be present. The court also concluded Hospice was "charged" with notice of the second tank under the doctrine of "imputed notice."

3. *The Release Contemplated That Other Sources of Contamination Might Be Present, but Clearly and Unambiguously Released County From Any Liability for Pollutants Which Might Thereafter Be Discovered*

This court has held that a general release can be completely enforceable and act as a complete bar to all claims (known or unknown at the time of the release) despite protestations by one of the parties that he did not intend to release certain types of claims. (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1173 [6 Cal.Rptr.2d 554].)

Examination of the present release convinces us it was intended and designed to cover precisely the eventuality of an unknown source of contamination. The parties here declared that their dispute arose because County sold property to Hospice without disclosing certain areas of contamination. The parties then recite that "[a]dditional pollutants, contaminants, wastes or hazardous substances *may exist on the site which have not yet been discovered*," but that it was the parties' "intention and desire . . . to fully and finally resolve all disputes that exist or *hereafter could arise* between them with respect to the site." (Italics added.) After specifying what obligations County agreed to undertake (i.e., the monetary payment plus payment of all costs necessary to abate the ash contamination), the release provided that Hospice would fully release County from all claims ". . . past, present and future, known or unknown, suspected or unsuspected with respect to the site. . . ." To eliminate any doubt as to the scope of the release, the parties recited and expressly waived the protections afforded by Civil Code section 1542.

This case is controlled by *Winet.* In *Winet* the releasor argued that a similarly constructed release, which explicitly covered "unknown or unanticipated" claims, was not intended to cover claims for malpractice of which

he was unaware. This court affirmed the summary judgment in favor of the releasee, noting (1) both parties had been represented by counsel; (2) the releasor had been aware of the potential of a suit for malpractice; (3) with this awareness and advice of counsel the releasor agreed to release unknown claims, explicitly waiving the protections of Civil Code section 1542. This court concluded: "Under these circumstances we may not give credence to a claim that a party did not intend clear and direct language to be effective." (*Winet* v. *Price, supra,* 4 Cal.App.4th at p. 1168.)

Similarly, Hospice was represented by counsel. Hospice was clearly aware of both its legal rights to sue for damages for contamination and the potential for undiscovered sources of pollution to be still plaguing the site. With this awareness and advice of counsel Hospice agreed to release unknown claims and explicitly waived the protections of Civil Code section 1542. Hospice cannot now contend it did not understand the risks it assumed or did not intend to release County from unknown problems.

### 4. *The Trial Court Correctly Rejected Hospice's Effort to Vitiate the Release Based on Fraud*

Hospice claims it may rescind the release because it was induced to enter into the agreement by County's "fraud." ■ We acknowledge that cases have suggested a releasor might be permitted to avoid a release if he was induced to enter the agreement because of fraud practiced by the releasee. (See, e.g., *King* v. *Associated Construction Corp.* (1960) 183 Cal.App.2d 818, 822 [7 Cal.Rptr. 182] [dictum].) However, the *King* case and others involved either "fraud in the inception" or misrepresentations by a fiduciary.[2] Neither doctrine is applicable here. Hospice does not claim it was

---

[2]Our review of the authorities discussing "fraud" as a basis for avoiding a release indicates there have been three scenarios in which a releasor was allowed to avoid his release. The first group involved "fraud in the inception"—that is, misrepresenting the nature or contents of the document being executed. (*Meyer* v. *Haas* (1899) 126 Cal. 560, 563 [58 P. 1042]; *Mairo* v. *Yellow Cab Co.* (1929) 208 Cal. 350, 352 [281 P. 66]; *Raynale* v. *Yellow Cab Co.* (1931) 115 Cal.App. 90, 92 [300 P. 991].) In the second type of case the release was obtained by a fiduciary without full disclosure of the relevant facts. (See, e.g., *Chung* v. *Johnston* (1954) 128 Cal.App.2d 157, 163-165 [274 P.2d 922].) A third group of cases (represented by *Chung* v. *Johnston, supra,* and *Ellis* v. *Jones* (1932) 121 Cal.App. 325 [8 P.2d 933]) has discussed fraud as a ground for not applying a release to an unknown claim. However, in this last group of cases the "fraud" prevented the releasor from knowing about his claim, and because Civil Code section 1542 specifies a release does not cover unknown claims under some conditions, the court simply held that the general release did not apply to the unknown claims. (See, e.g., *Chung* v. *Johnston, supra,* 128 Cal.App.2d at p. 163.)

unaware of the nature or contents of what it signed, nor does it contend County owed it any fiduciary obligations.[3]

Hospice's fraud claim is premised on an entirely distinct theory: fraudulent nondisclosure. Hospice claims County (1) "knew" of the second tank, based on "imputed knowledge," (2) had the duty to disclose the information, and (3) failed to disclose the information. We reject Hospice's theory because we perceive no basis for finding any duty to disclose in this case. (4) A party seeking rescission based on fraudulent nondisclosure must show (1) the defendant failed to disclose a material fact which he knew or believed to be true, and (2) the defendant had a duty to disclose that fact. (*Welch* v. *State of California* (1983) 139 Cal.App.3d 546, 556 [188 Cal.Rptr. 726].) The duty to disclose arises when two elements are present: (1) the material fact is known to (or accessible only to) the defendant; and (2) *the defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact.*[4] (*Reed* v. *King* (1983) 145 Cal.App.3d 261, 265 [193 Cal.Rptr. 130]; *Karoutas* v. *HomeFed. Bank* (1991) 232 Cal.App.3d 767, 771 [283 Cal.Rptr. 809].)

Since the second prong giving rise to an affirmative obligation to disclose rests on the defendant's knowledge of significant facts the plaintiff needs but does not have, we conclude the duty cannot arise when, as here, such significant facts are not *actually* known to the defendant. There is no evidence that when County entered the release it actually knew of the second tank, either from information possessed by current employees or records kept by County. Instead, Hospice claims the first element—knowledge of the

---

[3]Hospice's complaint did contain a count for "constructive fraud." This type of fraud requires a fiduciary relationship (*Byrum* v. *Brand* (1990) 219 Cal.App.3d 926, 937-938 [268 Cal.Rptr. 609]), but Hospice does not contend such a relationship existed here. Instead, Hospice concedes on appeal that its constructive fraud count merely restates its fraudulent nondisclosure claim.

[4]A duty to disclose may also arise in the so-called "half truth" context—that is, when a speaker makes a representation which, though not false, he knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation. (*McCue* v. *Bruce Enterprises, Inc.* (1964) 228 Cal.App.2d 21, 25-26 [39 Cal.Rptr. 125].) Hospice argues County had a duty to disclose under this theory because it made a representation (i.e., "[a]dditional pollutants . . . may exist on the site which have not yet been discovered"), which was misleading in implying there were no pollutants when in fact County "knew" of additional pollutants. We doubt whether a statement that other problems "may exist" could possibly mislead a person to understand that other problems "do not exist." However, since we conclude a duty to disclose requires some scienter, absent here, we need not separately evaluate whether the statement here was either a representation by County or one likely to mislead.

fact—can be satisfied merely by showing imputed knowledge.[5] Even assuming imputed knowledge satisfies the first element of the "duty" analysis, we cannot perceive how imputed knowledge can satisfy the second element giving rise to a duty to disclose: scienter. (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 738-739 [29 Cal.Rptr. 201, 8 A.L.R.3d 537] [duty to disclose requires scienter: defendant must know the facts *and* also know that plaintiff is ignorant of those facts].) In other words, Hospice seeks to charge County, as principal, with knowledge of something of which County was in fact unaware. If a principal is actually unaware of the material fact, how is the principal to *know* that the plaintiff is also unaware or cannot reasonably discover the material fact? The duty to disclose requires some element of scienter—knowledge of the other party's ignorance. We cannot perceive how it is possible for a principal to know the other party is ignorant of something of which the principal is equally ignorant.

We are unwilling to impose upon a party a duty to disclose when, as here, that party cannot possibly satisfy the duty. If we were to hold that County did have a "duty to disclose" something unknown to its current employees and not reflected in any of its records, we would be imposing upon County a duty it would be doomed to breach.

■ After closely examining the cases on which Hospice relied, we are unconvinced that they stand for any contrary conclusion. In one group of cases the courts imputed knowledge to the defendant based on information *actually* known to existing agents or employees. (See *People* v. *Forest E. Olson, Inc.* (1982) 137 Cal.App.3d 137, 139-140 [186 Cal.Rptr. 804]; *United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41, 51-52 [118 Cal.Rptr. 299]; *Sanders* v. *Magill* (1937) 9 Cal.2d 145, 154 [70 P.2d 159]; *Railroad Co.* v. *Spring Valley W. Co.* (1927) 87 Cal.App. 188, 192-193 [262 P. 53].) In the other group of cases the courts held that the entity had knowledge of what was *actually* contained in the records of the entity. (See, e.g., *Welch* v. *State of California* (1983) 139 Cal.App.3d 546, 556-557 [188 Cal.Rptr. 726]; *Rodriguez* v. *City of Los Angeles* (1963) 215 Cal.App.2d 463, 468-469 [30 Cal.Rptr. 180].) County may well have been obliged to disclose the second tank if any of its existing agents had actually known of its existence or if County records reflected that tank; however, neither element is present here.

Hospice, apparently recognizing that its claim falls outside the ambit of the foregoing authorities, relies on a passage in *Sanfran Co.* v. *Rees Blow*

---

[5]Hospice imputes knowledge by arguing that an agent of County knew (at some point during this century) of the second tank, and that therefore County is charged ad infinitum with knowledge of the second tank, even though no current employee had actual knowledge and the records held by County were devoid of any actual record of the second tank.

*Pipe Mfg. Co.* (1959) 168 Cal.App.2d 191 [335 P.2d 995] for the proposition that so long as some agent in the past had been aware of a fact, the entity remains charged with his knowledge even though the agent has departed and the company records are silent on the issue. We are unpersuaded by *Sanfran.*

First, examination of *Sanfran* shows the passage on which Hospice relied was dictum. In *Sanfran* the plaintiff bought a building represented to be a "Class C" building. Plaintiff later sued for fraud, alleging the fraudulent acts included (1) concealing the fact that the building lacked the side walls necessary to qualify as a "Class C" building, and (2) concealing the fact that the building had been modified in violation of certain permit requirements. (*Sanfran Co. v. Rees Blow Pipe Mfg. Co., supra,* 168 Cal.App.2d at pp. 203-204.) On appeal from the judgment in plaintiff's favor, defendant claimed the judgment was not supported by the evidence. The court found ample evidence of the first concealment, since an *existing* officer of the defendant *actually* knew of the true facts but failed to disclose them. (*Id.* at p. 203.) In the passage on which Hospice relied, the *Sanfran* court opined that the second concealment had also been proved, even though existing officers did not know of the permit violations, because a prior corporate agent had known of the permit requirements, and "no subsequent change of officers could take away this notice and knowledge" imputed to the entity. (*Id.* at p. 204.) Although Hospice seizes on this latter aspect of *Sanfran,* Hospice overlooks the fact that the *Sanfran* court *specifically prefaced this "imputed knowledge" analysis by noting it was unnecessary to its decision.* (*Ibid.*) Thus, the "imputed knowledge" analysis in *Sanfran* is entirely dictum.[6]

Additionally, the *Sanfran* analysis rested on a single case—*The Mechanics' Bank of Alexandria v. Seton* (1828) 26 U.S. (1 Pet.) 299 [7 L.Ed. 152] (hereafter *Seton*). Despite its ancient vintage, *Seton* has not been cited by any California case (other than the *Sanfran* dictum) for the proposition that an entity is forever charged with the duty to disclose information known to prior agents but unknown to current agents and unreflected by records of the entity.[7] Although Hospice is represented by able counsel who have thoroughly briefed the relevant issues, of the cases cited only *Seton* and the *Sanfran* dictum it spawned serve as authority for Hospice's position. We

---

[6]In addition, *Sanfran* did not indicate, one way or the other, whether the knowledge it "imputed" as to the permit requirements might have been contained in the corporate files.

[7]We question whether *Seton* even stands for that proposition. In *Seton* the issue was whether the bank could levy on stock held in the name of a Mr. Lynn, or whether it was charged with notice that Lynn held it as trustee for third parties. Lynn knew of the status of the stock, and apparently was a current member of the board of directors for the bank (*Seton, supra,* 26 U.S. at p. 302 [7 L.Ed. at pp. 153-154]); hence, it appears a *current* agent had notice

decline to perpetuate such a thinly grounded holding, particularly because it would create an obligation of disclosure which as a practical matter would always be violated.

### 5. *Hospice Cannot Rescind the Release Based on Economic Duress*

Hospice alternatively argues it is entitled to rescind the release because of "economic duress."[8] ▮ Economic duress has been recognized as a basis for rescinding a settlement. However, the courts, in desiring to protect the freedom of contracts and to accord finality to a privately negotiated dispute resolution, are reluctant to set aside settlements and will apply "economic duress" only in limited circumstances and as a "last resort." (*Rich & Whillock, Inc.* v. *Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158-1159 [204 Cal.Rptr. 86].) In *Rich & Whillock* this court noted that reasonable settlements are both acceptable and desirable, but that "wrongful exploitation of business exigencies to obtain disproportionate exchanges of value" (*id.* at p. 1159) can be set aside. In *Rich & Whillock* several criteria coalesced to raise "economic duress" as a ground to escape a settlement: (1) the debtor knew there was no legitimate dispute and that it was liable for the full amount; (2) the debtor nevertheless refused in bad faith to pay and thereby created the economic duress of imminent bankruptcy; (3) the debtor, knowing the vulnerability its own bad faith had created, used the situation to escape an acknowledged debt; and (4) the creditor was forced to accept an inequitably low amount. (*Id.* at pp. 1156-1157.)

▮ None of the factors present in *Rich & Whillock* was present here *when the settlement was entered into*. There was a legitimate dispute over liability, rather than an acknowledged debt. The "duress" arose not from County's refusal to pay an acknowledged debt but from the discovery of contamination. Most importantly, County did not use Hospice's plight to force Hospice to accept an inequitably low amount; instead, it appears County agreed to pay the *entire* cost of cleaning up those contaminants known to the parties. While in hindsight this settlement was less than Hospice could have sought from County, at the time of the agreement the settlement amount can hardly be deemed an inequitably low settlement.

In summary, there was a legitimate dispute, an uncertain amount owed, and a settlement shown to be not harsh when measured as of the time it was

---

of the fact to be imputed. *Seton's* facts thus undercut the precise proposition for which it was cited by *Sanfran.*

[8]We question whether economic duress should be considered on its merits, since (1) it was not pleaded as a basis for rescission; (2) Hospice never sought leave to amend to raise the claim; and (3) it was first asserted in Hospice's opposition to County's motion for summary judgment. In light of our conclusion, however, any prejudice to County resulting from encountering this tardy claim is harmless.

entered. Under these circumstances economic duress cannot be invoked merely because it was unwise in retrospect for Hospice to have assumed certain risks.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.